**STATE of Tennessee, Appellee,**

v.

**Lee Etta FUGATE, Appellant.**

Court of Criminal Appeals of Tennessee, at Knoxville.

Dec. 7, 1988.

Permission to Appeal Denied by Supreme Court April 3, 1989.

W.J. Michael Cody, Atty. Gen., Miriam Nabors Banks, Asst. Atty. Gen., Doug Godby, Asst. Dist. Atty. Gen., for appellee.

James D. Estep, Jr., and Robert M. Estep, Tazewell, for appellant.

## OPINION

BIRCH, Judge.

Lee Etta Fugate was tried and convicted of first-degree murder. Her sentence is life imprisonment.

We now consider her appeal of right in which she raises several issues, the first of which challenges the sufficiency of the convicting evidence. In other issues she contests the admission of certain evidence; namely, her statement made shortly after the incident, the testimony of Sheriff Gibson about his conversation with the victim, and several checks drawn on the Fugate's joint account.

We have thoroughly reviewed the record and considered all the evidence in a most careful manner. We find no reversible error and accordingly affirm the judgment.

## SUFFICIENCY OF THE EVIDENCE

In her first issue, the defendant insists that the evidence was insufficient for the jury to find her guilty of first-degree murder beyond a reasonable doubt. She bases this insistence on three grounds:

1. Proof as to premeditation, deliberation, and malice was insufficient;
2. She acted in defense of self;

and

3. Her actions were consistent only with voluntary manslaughter.

Summarizing the state's evidence, Randall Lucas was on duty at the Hancock County Sheriff's office the morning of February 22, 1987. At about 7 o'clock, a female reported by phone, "I believe I shot Toby [sic] Fugate." Because the caller gave no details, Lucas called the phone number listed to Colby Fugate and asked the person who answered the phone, "Are you sure you shot Colby Fugate?" She replied, "Somebody needs to get over here as quick as possible." Lee Etta Fugate, the defendant, was the person who made the first call and answered the second.

Lucas and Deputy Sheriff Martin arrived at the Fugate residence at about 7:30 a.m. The defendant let them in and immediately handed them a weapon and said, "Here's the gun I used to do it with." Although the defendant did not respond to their requests to tell them just where in the house the victim was, a daughter, Gena, directed them to a bedroom, where they found Colby Fugate lying on the floor. They determined that he had been shot in the head. They saw blood on the floor, on the bed, on the dresser, on the wall, on the door-facing, and on a calendar which hung on the wall. The blood had dried and had matted in his hair. His pajama bottoms were down around his ankles. They observed signs of life.

The defendant made no effort to assist Colby Fugate either before help arrived or after. She was presentably clothed, and her hair looked to be in place. Officers saw no bruises or marks on her.

Gene Gibson, the Hancock County Sheriff, arrived at about 8 a.m. The defendant showed him a hole in a couch which she said had been caused by a bullet fired in her attempted suicide January 23, 1986. The Sheriff did not look for the bullet fired into the couch, although he recovered a spent bullet lying on the dining room floor.

The defendant was arrested and transported to jail. After having been advised of her *Miranda* rights, she gave a statement to Ray Presnell, Tennessee Bureau of Investigation. The significant portions are summarized as follows:

1. She and Colby Fugate had argued almost daily over several matters, including health, finances, and suspicions that because their union was not a legal marriage, the defendant had no legal right to anything. These arguments had never resulted in physical violence, and no physical violence had occurred the night before the shooting.
2. She remembered having the gun before and after the shooting, but remembered no other significant circumstance such as why she had the gun close by or pulling the trigger. She did not remember exactly where the victim was when the shot was fired, nor did she remember what he was doing at the time the shot was fired.

Sheriff Gibson stated to the jury that about a month before the shooting, Lee Etta Fugate told him Colby Fugate had accused one of the Fugate daughters of forging checks on his bank account and that he was planning to let her go to jail over it. Along the same lines, the Sheriff also testified that Colby Fugate sought him out a week after his conversation with Lee Etta Fugate and told him, "I think there's been some checks forged on me and when I get it together I'll get back with you and then you'll be putting someone in jail."

Clellan Blake, M.D., the county medical examiner, testified that the death was caused by a gunshot wound to the head. In his opinion, Colby Fugate was capable of moving about for some five or ten minutes after sustaining the wound, and, based on the emergency effort at the hospital, had remained alive for an undetermined period of time.

He testified that the blood stains on the walls, door-facing, dresser, calendar, chest of drawers and pajamas were all caused by transferring the blood from its source to the hand, and then smearing it from the hand to the surface upon which it was found. As to the stains on the bed, his opinion was that these were caused by blood which seeped from the wound. Dr. Blake testified further that observations made and tests done support his conclusion that the fatal shot passed through some sort of "screen" before striking the victim. This screen, he said, could have been cloth.

Tommy Heflin, a firearms expert employed by the Tennessee Bureau of Investigation, microscopically examined the bullet recovered from the dining room and the bullet recovered from the couch. In his opinion, both were fired from the pistol defendant had surrendered to the investigating officers. Also, he testified that based on his observations of pertinent evidence and calculations, the bullet was fired from less than three feet.

John Trent, a bank officer, testified that the Fugates had maintained a joint checking account in his bank, and that either the signature of Colby Fugate or that of Mrs. Colby Fugate was necessary for the bank to honor checks. Trent said that between August and November 1986, the balance reached $75,000. On November 24, 1986, the account was overdrawn by approximately $400. Colby Fugate called on John Trent December 9, 1986, relating an inability to understand why the account was overdrawn. He told the banker that he had not been receiving his account statements. After more discussion, Colby Fugate paid the overdrafts and closed the account.

Lee Etta Fugate, testifying in her own behalf, characterized the deceased as a man given to violence toward her and others. To support this characterization, she related two incidents—one in 1984 and the other in 1986—which had resulted in physical injury to her, and two incidents in which the defendant had been violent toward other persons, apparently without provocation.

She said that she always took the pistol with her as she moved about the house.

She testified that on the night in question, she and Colby Fugate retired to their separate bedrooms (hers upstairs, his downstairs) at about 11 p.m. She went downstairs later to sleep on the couch, taking the pistol with her. At about 5:30—6:00 a.m., she passed through his room on her way to the bathroom. Colby Fugate awakened, cursed, and sought to force sex. A scuffle ensued as he was pulling his pants down. Defendant avoided him, but not before he kicked her in the rear and knocked her into a dresser. She heard him coming toward her. She retrieved the pistol from the couch and started to her bedroom. When she got to the stairs, Colby Fugate forced her into his bedroom.

Lee Etta Fugate testified that the actual shooting occurred in the following manner:

... He pushed me over on the bed and I rolled over to the other side. I remembered the gun in my pocket and I thought it might go off or that he might find it. I slipped it out of my pocket and laid it on the floor beside the bed. By that time he was back in and he got hold of me and throwed me over to him and I told him to leave me alone. He said, I ought to knock your g-d teeth down your

throat and pushed me back over. He was moving around and fumbling around with the cover, and he reached over and was feeling around my neck. I didn't know what he was going to do. I reached over the side of the bed and got the gun and was holding it under me. I got up on my knees and humped up, rolled up, and he got hold of my shirt, around my neck and he was shaking me and he was getting tighter. It was hurting my neck and my head was getting weak and I thought I was going to drop the gun and I held it with both hand, and I will pulling away from him and somehow he got hold of the cover and my knees was on the cover and pulled me forward, and the gun went off. I thought, my God, what have I done. It [sic] got off the bed and went to the kitchen I was shaking and I was tore all to pieces, and I looked down and I had the gun in my hand. I didn't know what to do. I started going from the living to the kitchen, the kitchen to the living room, back and forth, and I thought I heard Colby up. Somehow I got to the phone and I called the police and told them my name and I told them I thought I shot Colby. My mind was coming and going and I went upstairs nad [sic] woke Gena up and I hold her, I said, Gena, honey, I think I've shot Colby. I was just going all over the rooms. Somehow I needed to change shirts. I was trying to change my shirt and the next think I remembered I was sitting downstairs in the living room on the chair.

She testified that her blouse was torn during the scuffle and exhibited it to the jury. She explained that the variance between her statement to Agent Presnell and her trial testimony was due to her reluctance "to get up in front of the world and tell stuff like this."

On cross-examination, the defendant acknowledged that Colby Fugate owned tracts of land in Hancock County and in its adjoining Virginia county, Lee, about 770 acres in all. She admitted concern over the legality of her marriage to Colby Fugate, and had urged him to "make it legal," but he never did. Responding further to the cross-examiner's questions, she testified that she "didn't mean to kill him."

Virginia Spence, defendant's niece, and her husband, Jerry Spence, testified concerning the defendant's condition at about noon when they saw her at the jail. They both thought the defendant was confused and weak.

The state presented in rebuttal the testimony of two of Colby Fugate's close friends. They both told of Colby Fugate's remarks to them that as to sex, he was uninterested and unable.

We review this issue to determine whether any rational trier of fact could have found the elements of first-degree murder beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); Tennessee Rules of Appellate Procedure 13(e). In making this determination, we are guided by the settled principle that a jury verdict approved by the trial judge accredits the testimony of the witnesses for the state and resolves all conflicts in favor of the state's theory. *State v. Hatchett*, 560 S.W.2d 627, 630 (Tenn.1978). Also, on appeal, the state is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn.1978).

Deliberation and premeditation involve a prior intention or design on defendant's part to kill, however short the interval between the plan and its execution. It is sufficient if only a moment elapses between the plan and its execution as long as the jury can conclude from the evidence that there was some appreciable interval, however small. *Sikes v. State*, 524 S.W.2d 483, 485 (Tenn.1975).

To determine this question—premeditation—the jury may consider all of the circumstances occurring before and during the killing, *State v. Houston*, 593 S.W.2d 267, 273 (Tenn.1980), as well as those occurring thereafter. *Sneed v. State*, 546 S.W.2d 254, 258 (Tenn.Crim.App.1976), *cert. denied* January 24, 1977.

Premeditation may be proved by direct or circumstantial evidence. *State v. Browning,* 666 S.W.2d 80, 84 (Tenn.Crim. App.1983), *p.t.a. denied* January 30, 1984; *State v. Ward,* 663 S.W.2d 805, 809 (Tenn. Crim.App.1983), *p.t.a. denied* August 1, 1983; *Covey v. State,* 504 S.W.2d 387, 390 (Tenn.Crim.App.1973), *cert. denied* November 19, 1973.

■ The state's theory obviously was that the defendant planned to kill Colby Fugate, and did. In support of this theory, now accredited, the state's evidence taken in its best light, together with all legitimate inferences, tends to prove that:

1. The possibility that their union of 19 years was not a legal marriage perturbed the defendant, and she was dissatisfied with the victim's inaction toward its legalization. Because of this cloud over the union, she was fearful that she would not share in Colby Fugate's estate, which then included substantial acreage and a large herd of cattle.

2. Colby Fugate had discovered the involvement of defendant and daughter in a scheme whereby unauthorized signatures were affixed to several checks drawn on the joint account of defendant and victim in the approximate amount of $20,000.00. The defendant knew that Colby Fugate had uncovered this scheme, and that he was about to take action. This matter was so significant to both Colby Fugate and Lee Etta Fugate that each mentioned it to the Sheriff in separate conversations about a week apart approximately a month before the killing.

3. The defendant kept a loaded weapon close by at all times.

4. The shot was fired as the victim lay on his back in the bed, the bullet having passed through bed linen before striking the victim.

5. After the shooting, the defendant did not call an ambulance, nor did she ask Gena to help. She made no attempt to assist the victim even though she heard him moving about. The defendant did not direct arriving officers to the bedroom where the victim lay.

6. Her hair was in place, and there were no bruises or marks visible to the investigating officers. She appeared calm.

7. In her statement given later on the same morning of the killing, she included nothing about a scuffle immediately prior to the killing.

We conclude that this evidence supports the jury's finding of premeditation and deliberation.

■ The element of malice can be inferred by the jury from the defendant's intentional use of a deadly weapon. *State v. Martin,* 702 S.W.2d 560, 563 (Tenn.1985). The evidence in this case, viewed in the light most favorable to the state, indicates the defendant intended to shoot her husband. Thus, the jury was justified in basing its finding of malice solely upon her use of the deadly weapon.

■ In the second of defendant's three-part attack on the sufficiency of the evidence, she asserts that she is not guilty of first-degree murder because she acted in defense of self. *See Hughes v. State,* 3 Tenn.Crim.App. 602, 465 S.W.2d 892 (1970), *cert. denied* August 17, 1970; *Hudgen v. State,* 166 Tenn. 231, 60 S.W.2d 153 (1933); *Bitner v. State,* 130 Tenn. 144, 169 S.W. 565 (1914).

Whether a homicide is excusable because done in defense of self presents a classic question for jury determination. *State v. Venable,* 606 S.W.2d 298, 301 (Tenn.Crim. App.1980), *p.t.a. denied* September 15, 1980; *Arterburn v. State,* 216 Tenn. 240, 251, 391 S.W.2d 648, 653 (1965).

The jurors are the sole and only judges of the evidence, and of the weight to be given the swearing of each and every witness in the case. The credibility of the witnesses, the weight and value of their testimony, the inferences to be drawn from their statements and all factual issues raised by the testimony and evidence introduced—direct and circumstantial—are matters entrusted exclusively to them as the triers of facts. *Braziel v. State,* 529 S.W.2d 501, 505 (Tenn.Crim.App.1975), *cert. denied* September 2, 1975. Quite ob-

viously, the jury rejected defendant's defense of self-defense.

The last contention is that the proof shows only voluntary manslaughter. We disagree.

The jury must determine the offense of which the defendant is guilty (if guilty at all). The offense of first-degree murder includes the offense of voluntary manslaughter. We assume, in the absence of an issue concerning the instructions to the jury, that the jury could have convicted the defendant of voluntary manslaughter, or of any other lesser-included offense for that matter, if its view of the proof led to that conclusion. Clearly, it did not.

The jury is entitled to accept that part of the defendant's proof they feel is consistent with truth and reject that part they believe is false. *Batey v. State,* 527 S.W.2d 148, 150 (Tenn.Crim.App.1975), *cert. denied* August 11, 1975.

We conclude that the evidence substantially supports the jury finding that the defendant willfully, deliberately, maliciously, and with premeditation, killed Colby Fugate. This evidence meets the requirement of *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), and of Tennessee Rules of Appellate Procedure 13(e).

### ADMISSION OF DEFENDANT'S STATEMENT

■ For her next issue, the defendant assigns error to the trial court's admission of the waiver of rights she executed and the statement she made.

In ruling the statement admissible, the trial judge said

And there's no question but what the defendant, Mrs. Fugate, had been, for some time, ill and suffering from a variety of different ailments. She took medicine for those although she didn't think she took any the morning that she was questioned.

There's no question but what she was in a state of agitation, nervousness ..... certainly had been upset greatly, whether she caused the death of her husband or not, from the circumstances surrounding his death.

And she was in that state of some confusion, and nervousness, and upset, which I suppose was aggravated somewhat by her illness which she says has existed over a period of many years.

However, the testimony is equally clear that she was able to intelligently talk to the officers. She gave them facts and circumstances articulately that they would not have known otherwise. She was very deliberate in her talking to the officers and perhaps didn't always completely understand and had to be asked again, but she was able to ultimately talk to them and articulate the facts and circumstances surrounding the alleged killing....

There's been no evidence in this case of coercion by state agents. There is not real evidence of promises made, and certainly no evidence of threats, or force, or coercion used in any way to overcome the will ..... as weak as it was. And certainly it's a consideration that her will probably was weaker. But there's been no evidence that her will, in whatever state it was, was over borne in any way by the state officers, particularly the TBI Agent Mr. Presnell and Sheriff Gibson. Mrs. Fugate read over her statement. And the credible evidence is that she signed it and agreed that it was a correct statement of what she had told them. So, likewise, there's no evidence that she requested a lawyer, or even anyone in her behalf. There's no evidence that anyone in her behalf requsted [sic] the interrogation stop and not continue until a lawyer was present.

The only conclusion that I can come to from all the facts, and circumstances, and the evidence produced here today is that the waiver was voluntarily made and that the statement was voluntarily made, and that they are, under the law, admissible.

Certainly at the trial of the case, even though the statement is admissible, all the things that go to her condition when she gave the statement would be admis-

sible to go to the credibility of the statement and the trier of the fact, the jury. But legally it's admissible.

In considering this issue, we are bound by the findings of the trial judge if there is proof to support those findings. *State v. Donald*, 614 S.W.2d 66, 68 (Tenn.Crim.App. 1980), *p.t.a. denied* January 15, 1981.

We add to the above findings our observation that Agent Presnell and Sheriff Gibson were exceptionally considerate of defendant's circumstances and took extreme care to ensure the accuracy of the statement.

We find that the proof fully supports the finding of the trial judge that the statement was voluntarily made after defendant fully understood her rights. The evidence was properly admitted.

## ADMISSION OF THE CONVERSATION AND THE CHECKS

■ The defendant argues that the Sheriff's conversation with Colby Fugate was not relevant and should have been excluded.

In matters of relevance, Tennessee follows Section 401 of the Federal Rules of Evidence, the Supreme Court having adopted it in the case of *State v. Banks*, 564 S.W.2d 947, 949 (Tenn.1978). Section 401 provides that:

> Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the act more probable or less probable than it would be without the evidence.

The fact that Colby Fugate suspected the defendant's participation in a financial scheme against him is relevant on the issue of motive or premeditation. But the evidence, in our view, was of doubtful probative value because evidence of defendant's knowledge of Colby Fugate's suspicions was already before the jury. In light of defendant's perception of Colby Fugate's intentions, actual proof of his intentions was unnecessary. The admission of this evidence was harmless error, if error at all.

*See* Tennessee Rules of Appellate Procedure 36(b); Tenn.R.Crim.P. 52(a).

■ As to the admissibility of the checks, eight of them are signed "Lee Etta Fugate" rather than "Mrs. Colby Fugate," the latter of which is the authorized signature. These irregular checks are relevant insofar as they relate to motive. The additional three checks, bearing the purported signature of Colby Fugate, are regular on their face. They are relevant only if shown to have been forged. Since testimony as to signature comparison was withdrawn from the jury, there was no basis upon which the jury could find that they were forged; therefore, these three checks were not relevant. Their introduction, however, caused no prejudice. This, also, is harmless error, if error at all. *See* Tennessee Rules of Appellate Procedure 36(b); Tenn.R.Crim.P. 52(a).

We have painstakingly examined the entire record and considered all the issues. We conclude that the record contains no reversible error. Accordingly, we affirm the conviction of first-degree murder and the sentence of imprisonment for life.

DAUGHTREY and WADE, JJ., concur.