IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 20, 2000

## STATE OF TENNESSEE v. CHARLES RAY ALLEN

**Appeal from the Criminal Court for Davidson County**
**No. 98-C-1969     J. Randall Wyatt, Jr., Judge**

---

**No. M1999-00818-CCA-R3-CD Filed November 3, 2000**

---

The Defendant was convicted by a jury of first degree premeditated murder and criminal attempt to commit voluntary manslaughter. He was sentenced to life imprisonment for the murder, and to a consecutive four year term for the attempted manslaughter. In this appeal as of right, the Defendant challenges the sufficiency of the evidence; the trial court's exclusion of proof about the victim's prior violent conduct; the trial court's instruction to the jury about the penalties for first degree murder; and his sentencing. The judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed.**

DAVID H. WELLES, J., delivered the opinion of the court, in which JOE G. RILEY and NORMA MCGEE OGLE, JJ., joined.

Larry B. Hoover, Nashville, Tennessee, for the appellant, Charles Ray Allen.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; Victor S. Johnson, District Attorney General; and Dan Hamm, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

On April 15, 1998, the Defendant, Charles Ray Allen, shot and killed Joshua Graham and shot and injured Antonio Carter. The Defendant was charged with first degree premeditated murder and attempted first degree premeditated murder. Upon his trial, the jury convicted the Defendant of first degree premeditated murder for his killing of Graham and criminal attempt to commit voluntary manslaughter for his shooting of Carter. The Defendant received a sentence of life imprisonment for the murder and, after a sentencing hearing, a consecutive four year term for the attempted manslaughter. The Defendant now appeals as of right, raising the following five issues:

1. Whether the evidence is sufficient to support his conviction for first degree premeditated murder;

2. Whether the trial court erred when it excluded proof about Graham's prior violent conduct;

3. Whether the trial court erred when it informed the jury about the possible sentences for first degree murder;

4. Whether the trial court erred by sentencing him to the maximum term of four years for his attempted manslaughter conviction; and

5. Whether the trial court erred by ordering his sentences to run consecutively.

Upon our review of the record, we find no reversible error and affirm the judgment of the trial court.

## FACTS

Toshiba Floyd, murder victim Graham's girlfriend, testified that on the morning of his murder, April 15, 1998, she and Graham awoke together at about seven o'clock. Floyd left about forty-five minutes later to walk next door to work, leaving Graham with their son. Graham then dropped the boy off at the daycare center where Floyd worked at about 8:30 a.m. She and Graham talked for a few minutes before Graham left. According to Floyd, Graham drove a light brown Lincoln.

Graham had just started working for the other victim, Antonio Carter. Carter testified that he saw Graham on the job at approximately nine-twenty that morning and never saw him leave. At about twelve-twenty that afternoon, Carter, Graham and Charles Howse went to Cyn's restaurant for lunch. When they arrived, the Defendant was seated at a table with another man. Carter and Graham went into the restroom to wash their hands, staying about three minutes. When they reentered the restaurant, the Defendant was no longer at his table. Carter testified that food and drinks were sitting on the Defendant's table, "untouched." Carter said to Graham, "Dang, he must be scared of you or something." Carter and Graham got in line to order their food.

While Carter and Graham were getting their lunches, the Defendant reentered the restaurant and stood near them. According to Carter, the Defendant said in an angry voice, "What's up, Motherf---er? Huh? What's up now?" Carter testified that the Defendant was speaking to Graham. Graham put his hand on Carter's right shoulder, and as Carter turned to look, he saw the Defendant raising a gun in both hands. Carter tried to jump out of the way, but was shot in the right leg. Carter fell to the floor while the Defendant kept shooting. Graham was shot and fell down on top of Carter,

-2-

across Carter's legs. Carter raised up and was shot again. He then decided to "play dead." Nevertheless, the Defendant shot Carter twice more, all four shots hitting his legs.

Carter testified that the Defendant had been two to three feet away from him and Graham during the shooting. He had never seen the Defendant before. Carter stated that he had had no weapon, and he saw none on Graham.

Ronniea Dozier was working the cash register at Cyn's during the shooting. She testified that there had been four to five other customers in the restaurant when Carter, Graham and Howse came in. When Carter and Graham went into the restroom, she said, the Defendant came up and asked to use the telephone. Before she answered, he said, "that's okay." The Defendant then asked if he and his companion could leave their plates on the table, that they'd be right back. The Defendant and his companion then left the restaurant through the side door.

About five minutes later, Dozier stated, she saw the Defendant coming in the front door from a purple Nova. When he got inside, he said to Graham, "What's up, now?" The Defendant then pulled a handgun and began firing. Dozier ducked behind the cash register. After the Defendant left, she called 911. Dozier testified that she saw no weapons other than the Defendant's.

Officer Jerry Bottoms was the first officer on the scene, and he saw Graham lying on top of Carter. He testified that four shell casings were found at the scene, but no weapons. Officer James Brown testified that he found a purple Nova about four blocks from the restaurant. Detective Tim Mason testified that the Nova was registered to the Defendant and that he found the Defendant at home on April 19, 1998. The Defendant accompanied Mason to headquarters and gave a statement.

According to the Defendant's statement to Detective Mason, he and Trenell Copeland had been walking to a market at about seven o'clock on the morning of April 15. A brown Lincoln pulled up and a man opened the door, saying, "set that shit out." When the Defendant protested, the man got out of the car, cocked a pistol, and put the gun to the Defendant's head. The Defendant then gave the man the $125 he had with him. The Defendant stated to Detective Mason that he had gotten his gun after the robbery and swore that he would kill the man who had just robbed him.

According to the Defendant's statement, he went to Cyn's restaurant that day at about noon, carrying his gun. He had just gotten his food and sat down when he saw Graham walk in. The Defendant recognized Graham as the man who had robbed him, and so he "got real nervous." When the Defendant looked at Graham, Graham looked back and "gave [him] a little funny look." When Graham went into the restroom, the Defendant worried that Graham might shoot him when he came back out. The Defendant walked out the side door of the restaurant, returning through the front door as Graham stood at the counter. According to the Defendant's statement, he then "went up there to [Graham and] said, hey, you know what the f--k this for, you ain't gonna rob nobody else." The Defendant then began firing, shooting "probably three or four times." After the Defendant saw that he had hit Graham and saw Graham on the floor, he left. He told Detective Mason that he gave the gun to Marquise Fleming who "got rid of it."

-3-

Dr. John E. Gerber performed the autopsy on Graham and testified that Graham had been shot three times, with one of the wounds being fatal. All three bullets remained in Graham's body. The shots had been fired from a distance of more than two feet. Tests for alcohol and drugs in Graham's body were negative. He was six feet two and one-half inches tall and weighed two hundred forty-eight pounds at the time of his death. He was twenty years old.

The Defendant testified on his own behalf, stating that Graham had robbed him at gunpoint at approximately seven-thirty that morning. He testified that, after he gave Graham his money, Graham told him, "The next time I see you I'm going to kill you, I'm going to burn you." The Defendant explained that he did not know Graham at that time. He also testified that he was carrying his gun during the robbery.

After the robbery, the Defendant testified, he went to Arzelia Playmate's house. He was very upset and crying, and he remained at Playmate's house until lunchtime. He did not report the robbery to the police. He decided to go to Cyn's restaurant to eat, after Copeland gave him five dollars for lunch money. He went to Cyn's with Keith Jackson. As they were sitting at their table preparing to eat, the Defendant looked up and saw Graham. His first thought, he testified, was that he was "about to die" because of what Graham had told him earlier. He stated that Graham was whispering to Carter and that they were looking at him. Graham and Carter then went to the restroom, and the Defendant told Jackson, "That's the guy that robbed me this morning. I'm fixing to leave." He testified that he and Jackson left through the side door, and Jackson ran down the street. The Defendant walked to the front entrance where his car was parked. He was "going to try to get to [his] car, to just leave." As he approached his car, however, he saw Graham looking out the window at him. The Defendant testified that he was "angry and afraid," and he reentered the restaurant through the front door. Graham asked him, "What's up?" The Defendant testified that he responded by yelling, "What's up?" He saw Graham "kind of ma[ke] a funny move." The Defendant testified that he thought Graham "was reaching for something." So, the Defendant stated, he pulled his gun.

The Defendant testified that he shot his gun three or four times and shot Carter because Graham pulled Carter in front of him. After the shooting, the Defendant stated, he left, got in his car, and went home.

On cross-examination, the Defendant testified that he had thrown his gun into the Cumberland River. He explained that he had told the police something else because he "really wasn't in [his] right state of mind." He stated he had been "afraid and scared and didn't know how to talk to [the detective]." He stated that he did not remember telling the police that he had sworn to kill the man who had robbed him, and he did not remember stating that he had told Graham before shooting him that, "you know what the f--k this is for. You ain't going to rob nobody else." The Defendant claimed that, while he was outside the restaurant, he "just felt that [Graham] was going to come out and get" him.

Arzelia Playmate testified that she saw the Defendant leaving her yard with Trenell Copeland at about seven or seven-thirty that morning. As she watched, she saw the two men talking with

-4-

someone in a brown Lincoln and saw "a guy put a gun out the window and open the car door at the same time." She testified the gun was pointed at the Defendant. She ran, and Copeland then ran into her house, saying that the Defendant had been robbed. The Defendant came in a few seconds later, crying and very upset. Playmate testified that the Defendant remained at her house until lunchtime.

## I. SUFFICIENCY OF THE EVIDENCE

The Defendant contends that the evidence is insufficient to support his conviction of first degree premeditated murder.[1] Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). In addition, because conviction by a trier of fact destroys the presumption of innocence and imposes a presumption of guilt, a convicted criminal defendant bears the burden of showing that the evidence was insufficient. McBee v. State, 372 S.W.2d 173, 176 (Tenn. 1963); see also State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992) (citing State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1976), and State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977)); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); Holt v. State, 357 S.W.2d 57, 61 (Tenn. 1962).

In its review of the evidence, an appellate court must afford the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." Tuggle, 639 S.W.2d at 914 (citing State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978)). The court may not "re-weigh or re-evaluate the evidence" in the record below. Evans, 838 S.W.2d at 191 (citing Cabbage, 571 S.W.2d at 836). Likewise, should the reviewing court find particular conflicts in the trial testimony, the court must resolve them in favor of the jury verdict or trial court judgment. Tuggle, 639 S.W.2d at 914.

The Defendant was convicted of first degree premeditated murder, the essential elements of which are a premeditated and intentional killing of another. Tenn. Code Ann. § 39-13-202(a)(1). A premeditated killing is one done after the exercise of reflection and judgment and where the intent to kill was formed prior to the killing itself. Id. § 39-13-202(d). The purpose to kill need not pre-exist in the killer's mind for any definite period of time. Id. The accused's state of mind at the time he decided to kill must, however, be carefully considered to determine whether he was sufficiently free from excitement and passion as to be capable of premeditation. Id. A defendant commits an intentional killing when he consciously tries to kill the victim. See id. § 39-11-302(a).

The Defendant does not argue that his actions in killing Graham were not intentional, nor would the facts support such an argument. The Defendant approached Graham, challenged him verbally, and then raised his handgun in both hands and began shooting at Graham from a very short

---

[1]The Defendant's statement of this issue in his brief appears to include a challenge to the sufficiency of the evidence supporting his conviction of criminal attempt to commit voluntary manslaughter. However, his brief contains no argument on this issue, nor any citations to the record or legal authority. Accordingly, any issue regarding the sufficiency of the evidence supporting the Defendant's second conviction is waived. Tenn. Ct. Crim. App. R. 10(b); State v. Killebrew, 760 S.W.2d 228, 231 (Tenn. Crim. App. 1988).

distance away. Graham was unarmed, yet the Defendant continued to shoot at Graham even after Graham fell to the floor. The Defendant fired at least seven rounds in Graham's direction before turning and fleeing the scene. The evidence is more than sufficient to support the jury's finding that the Defendant acted intentionally when he killed Graham.

The Defendant does argue, however, that the proof is insufficient to support the jury's finding that he killed Graham with premeditation. We disagree. Whether the Defendant killed the victim with premeditation is a question of fact for the jury and "may be established by proof of the circumstances surrounding the killing." State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). Circumstances which support an inference of premeditation include the use of a deadly weapon upon an unarmed victim; the defendant's declarations of intent to kill; the procurement of a weapon; and calmness immediately following the killing. Id. Multiple shots at the victim may also be considered, although they alone cannot establish premeditation. State v. Brown, 836 S.W.2d 530, 542 (Tenn. 1992). Other circumstances which may support an inference of premeditation include the defendant's attempt to shoot the victim again after he has been felled by a prior shot and rendered helpless, State v. Anderson, 835 S.W.2d 600, 605 (Tenn. Crim. App. 1992), and the accused's failure to render aid to the victim. State v. Fugate, 776 S.W.2d 541, 545 (Tenn. Crim. App. 1988).

In this case, the proof is more than sufficient to support the jury's finding that the Defendant acted with premeditation when he shot and killed Joshua Graham. The Defendant's own statement establishes that the Defendant had sworn to kill Graham earlier that day. The Defendant armed himself and went to Cyn's for lunch. As the Defendant was preparing to eat, he saw the victim enter the restaurant and go the restroom. The Defendant took this opportunity to leave the restaurant by the side door and walk around to the front door. From there, he observed the victim standing in line at the counter. The Defendant then reentered the restaurant through the front door, approached Graham, and verbally challenged him. The Defendant then raised his pistol in both hands and began firing at Graham from a distance of two to three feet away. The Defendant continued firing at Graham even after he had fallen to the floor. The Defendant fired at least seven shots toward Graham, striking him three times. The Defendant then left the scene in his car and took actions to conceal the murder weapon. These facts support the jury's finding that the Defendant killed Graham with premeditation, and this issue is therefore without merit.

## II. PROOF OF VICTIM'S PRIOR BAD ACTS

During the trial, the Defendant attempted to introduce proof that Graham had robbed and shot another person approximately a year before allegedly robbing him. Although the Defendant was not aware of this prior attack at the time Graham allegedly accosted him, he sought to introduce the evidence in support of his theory that Graham had been the "first aggressor" during their confrontation at Cyn's and that he shot Graham in self-defense. The trial court excluded the proffered evidence, ruling that the Defendant had not adequately demonstrated that Graham had been the first aggressor. The Defendant argues that the trial court erred in refusing to allow this proof.

A defendant may offer proof of a victim's prior violent acts under limited circumstances. If the defendant knew of the prior acts before his own confrontation with the victim, then proof of those prior acts may be admitted as substantive evidence to show that the defendant was afraid of the victim. State v. John D. Joslin, No. 03C01-9510-CR-00299, 1997 WL 583071, at *36 (Tenn. Crim. App., Knoxville, Sept. 22, 1997). Where, as here, the defendant was unaware of the victim's prior violent conduct at the time of their altercation, then proof of the victim's earlier conduct may be admitted only to corroborate the defendant's theory that he acted in self-defense and that the victim was the first aggressor. Id. at *36. There are three prerequisites to the introduction of corroborative evidence of the victim's first aggressor tendencies: there must be proof that the defendant acted against the victim in self-defense; the trial court must determine whether there is a factual basis underlying the defendant's allegations that the victim had first aggressor tendencies; and the trial court must determine whether the probative value of the corroborative evidence is outweighed by the potential for unfair prejudice. State v. Billy Joe Henderson, No. 03C01-9804-CR-00139, 1999 WL 398087, at *6 (Tenn. Crim. App., Knoxville, June 18, 1999), perm. appeal denied (Tenn. 1999), (citing State v. Ruane, 912 S.W.2d 766 (Tenn. Crim. App. 1995)).

Here, the Defendant testified that Graham robbed him at gunpoint and then told him he was going to kill him the next time he saw him. The Defendant further testified that, when he approached Graham in the restaurant several hours later, Graham "kind of made a funny move" and that the Defendant "felt [Graham] was reaching for something." The trial court ruled that this testimony was insufficient to show that Graham was the initial aggressor and did not proceed to consider the remaining two prerequisites for the introduction of the victim's prior conduct.

We respectfully disagree with the trial court's ruling. The Defendant's testimony was sufficient to raise the issue of self-defense such that the trial court should have proceeded with its analysis of the admissibility of the proffered proof.[2] However, we find the trial court's error in this regard to be harmless. First, we reject, as did the trial court, the Defendant's contention that Graham's status as first aggressor in the alleged robbery continued into and during the confrontation at Cyn's. Graham's alleged status as first aggressor that morning was nullified by the amount of time which passed between the alleged robbery and the confrontation at Cyn's and by the Defendant's actions in leaving Cyn's unharmed and unthreatened, yet returning to confront Graham.

Second, the proof which the Defendant wanted to introduce was that Graham had earlier shot another person while robbing him. Had the Defendant shot Graham during the alleged robbery, this proof would have been strongly corroborative of the Defendant's claim that Graham was the first aggressor. However, the Defendant shot Graham during lunch hour at a busy restaurant while Graham was unarmed. Moreover, there was absolutely no proof in the record other than the Defendant's own testimony that Graham made any move toward or against the Defendant while at Cyn's. That Graham shot someone during a robbery approximately a year before the Defendant shot Graham is only weak corroboration of the Defendant's claim that Graham was the first aggressor during their confrontation at Cyn's. Thus, we hold that the exclusion of proof of Graham's prior

_____

[2]Indeed, the trial court instructed the jury on the defense of self-defense.

violent conduct does not affirmatively appear to have affected the result of the trial on the merits, Tenn. R. Crim. P. 52(a), and does not require the reversal of the Defendant's conviction. See Tenn. R. App. P. 36(b). This issue is without merit.

### III. INSTRUCTION TO JURY ON PENALTIES

We next address the Defendant's contention that the trial court committed reversible error when it told prospective jurors during voir dire that the State was not seeking either the death penalty or the penalty of life without parole on the murder charge and that "should [the jury] return a verdict of guilty of First Degree Murder, then the automatic sentence that would come from this trial would be an automatic life sentence." The trial judge repeated this information during his charge to the jury. The Defendant contends that this instruction constitutes plain error entitling him to a new trial. We respectfully disagree.

The Defendant's trial began in June 1999. Effective May 18, 1998, the pertinent statute provides:

> In all contested criminal cases, except for capital crimes which are governed by the procedures contained in §§ 39-13-204 and 39-13-205, and as necessary to comply with the Constitution of Tennessee, article VI, section 14, and § 40-35-301, the judge shall not instruct the jury, nor shall the attorneys be permitted to comment at any time to the jury, on possible penalties for the offense charged nor all lesser included offenses.

Tenn. Code Ann. § 40-35-201(b) (Supp. 1999). Under the statute, the trial judge's remarks to the prospective jurors and his later instruction to the jury about the penalties for first degree murder were error.[3]

A panel of this Court has previously addressed this issue and found the trial court's error to be harmless. In State v. Edward Pinchon, No. M1999-00994-CCA-R3-CD, 2000 WL 284071 (Tenn. Crim. App., Nashville, March 17, 2000), the defendant was tried in September 1999 for first degree murder. The trial judge instructed the jury that the punishment for the charged offense was life imprisonment or life imprisonment without parole. He further informed the jury that the State was not seeking the punishment of life without parole, hence a verdict of guilty would result in life imprisonment. The jury was instructed to consider both first degree murder and the lesser offense of second-degree murder. The jury found the defendant guilty of first degree murder.

---

[3]Had the trial judge merely informed the jury that the State was not seeking the death penalty, we would find no error. See State v. Billy Gene DeBow, No. M1999-02678-CCA-R3-CD, 2000 WL 1137465, at *8 (Tenn. Crim. App., Nashville, Aug. 2, 2000).

In addressing the issue, this Court stated that, for the defendant to have demonstrated that he was harmed by the challenged charge, he "must demonstrate that, but for the erroneous instruction, there is a reasonable probability the jury would have acquitted him of first degree murder and found him guilty of the lesser offense of second degree murder or guilty of no offense at all." Id. at *4. In light of the evidence adduced at the trial, this Court concluded that "[i]t is, at best, improbable that the jury would have opted for second degree murder, much less acquittal, had the instruction been omitted." Id.

The case before us warrants a similar conclusion. With respect to the Defendant's killing of Graham, the trial court instructed the jury on first degree premeditated murder; second degree murder; and voluntary manslaughter. The State's proof was that the Defendant killed Graham intentionally and with premeditation. The Defendant's theory was that he shot Graham out of fear and anger, and in self-defense. The jury clearly rejected the Defendant's explanation, and the proof was more than sufficient to support the jury's conclusion. There is absolutely no indication in the record that the jury would have convicted the Defendant of either of the lesser offenses, or acquitted him, had the challenged information not been provided. Since the trial court's error in instructing the jury about the penalties for first degree murder does not "affirmatively appear to have affected the result of the trial on the merits," Tenn. R. Crim. P. 52(a), the Defendant is not entitled to a new trial on this ground. This issue is without merit.

## IV. SENTENCING

The Defendant was sentenced to life imprisonment for his conviction of first degree murder. For his conviction of criminal attempt to commit voluntary manslaughter, he was sentenced to a consecutive term of four years. The Defendant contends that the four year sentence is too long and that it should not have been run consecutively to his life sentence.

When an accused challenges the length, range, or manner of service of a sentence, this Court has a duty to conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

When conducting a de novo review of a sentence, this Court must consider: (a) the evidence, if any, received at the trial and sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) any statutory mitigating or enhancement factors; (f) any statement made by the defendant regarding sentencing; and (g) the potential or lack of potential for rehabilitation or treatment. State v. Thomas, 755 S.W.2d 838, 844 (Tenn. Crim. App. 1988); Tenn. Code Ann. §§ 40-35-102, -103, -210.

If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence even if we would have preferred a different result. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

The Defendant was determined to be a Range I, standard offender. The range of punishment for criminal attempt to commit voluntary manslaughter, a Class D felony,[4] is therefore two to four years. Tenn. Code Ann. § 40-35-112(a)(4). The presumptive length of a sentence for a Class D felony is the minimum number of years in the applicable range. Id. § 40-35-210(c). If there are enhancement factors, the trial court may sentence above the minimum, but must remain within the range. Id. § 40-35-201(d). If there are also mitigating factors, the court must enhance the sentence within the range as appropriate for the enhancement factors and then reduce the sentence within the range as appropriate for the mitigating factors. Id. § 40-35-210(e).

Here, the trial court imposed the maximum sentence based on two enhancement factors and no mitigating factors. The trial court found that the Defendant has a previous history of criminal convictions and that he has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community.[5] Id. § 40-35-114(1), (8). A maximum term of years within the applicable range has been found appropriate on the basis of two enhancement factors and no mitigating factors. See, e.g., State v. Ball, 987 S.W.2d 859, 861 (Tenn. Crim. App. 1998); State v. Ealey, 959 S.W.2d 605, 613-14 (Tenn. Crim. App. 1997). We see no error or abuse of discretion in the trial court's decision in this regard.[6]

The trial court ordered that the Defendant's sentences be served consecutively on the basis that he is an offender whose record of criminal activity is extensive and that he is a dangerous offender whose behavior indicates little or no regard for human life, and who had no hesitation about committing a crime in which the risk to human life was high. Tenn. Code Ann. § 40-35-115(a)(2), (4). Although we are unable to review the Defendant's criminal history due to his failure to include the presentence report in the record on this appeal, we certainly agree with the trial court that the Defendant is a dangerous offender. The Defendant walked into a busy restaurant during lunch hour, walked up to the line at the counter where several people were located, pulled a gun and began firing. He fired a total of seven shots, four of them hitting an innocent bystander. The Defendant's behavior

---

[4] See Tenn. Code Ann. §§ 39-13-211(b), 39-12-107(a).

[5] The trial court also mentioned as an enhancement factor that the Defendant used a gun to commit the offense, Tenn. Code Ann. § 40-35-114(9), and that the Defendant's youth was a mitigating factor. Tenn. Code Ann. § 40-35-113(6). However, the court appeared to give these factors little or no weight in its sentencing decision.

[6] We note that the presentence report is not included in the record on appeal. It is the appellant's burden to prepare a complete record. Tenn. R. App. P. 24(b). The Defendant's failure to do so with respect to his sentencing issues results in a presumption that the trial court's findings are supported by sufficient evidence. State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App., 1991).

could hardly show less regard for human life, and he certainly showed no hesitation in committing his crimes. The trial court made no error in designating the Defendant a dangerous offender eligible for consecutive sentencing.

However, consecutive sentences may not be imposed on a dangerous offender unless there is also a finding that an extended sentence is necessary to protect the public against further criminal conduct by the defendant. State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995). Furthermore, there must also be a finding that the consecutive sentences reasonably relate to the severity of the offenses committed. Id. The trial court in this case did not address these two prerequisites for consecutive sentencing.[7] Nevertheless, we hold that the record establishes these requirements. In an effort to avenge himself, the Defendant strode into a public place during regular business hours, pulled a gun, and began firing repeatedly at his intended target. He kept firing after he hit an innocent bystander and after his target fell. Indeed, he shot the innocent bystander more times than he shot the man he was aiming at. Clearly, the presence of the public offers no deterrence to this Defendant once he decides to shoot someone. Just as clearly, the public must be protected from any further shooting rampage by the Defendant.

We also find that the Defendant's consecutive sentences are reasonably related to the severity of his offenses. He repeatedly shot two unarmed men in cold blood while they stood in a public place waiting for their lunches. The Defendant killed his intended victim and grievously wounded the other man, someone he did not even know. The Defendant's conduct terrorized everyone in the restaurant. Consecutive sentences are appropriate.

The Defendant's contentions regarding his convictions and sentences are without merit. The judgment of the trial court is affirmed.

_____
DAVID H. WELLES, JUDGE

---

[7]These two factors need not be established when consecutive sentences are ordered on the finding that the defendant is an offender whose record of criminal activity is extensive. See State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999).