IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 15, 2017

**STATE OF TENNESSEE v. RONALD ORLANDO GLENN**

**Appeal from the Criminal Court for Davidson County
No. 2015-B-1366    J. Randall Wyatt, Jr., Judge**

_____

**No. M2017-00110-CCA-R3-CD**

_____

Defendant, Ronald Orlando Glenn, was convicted of domestic assault following a bench trial. He was sentenced to eleven months and twenty-nine days, to be released on supervised probation after serving ten days, and to complete a Batterer's Intervention Program. On appeal, Defendant contends that the evidence is insufficient to support his conviction. After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and ROBERT L. HOLLOWAY, JR., JJ., joined.

Dwight E. Scott, Nashville, Tennessee, for the appellant, Ronald Orlando Glenn.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Senior Counsel; Glenn R. Funk, District Attorney General; and Jeffrey Jackson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Background*

On October 12, 2014, the victim and Defendant had agreed to meet in the parking lot of the Kroger store located at 2284 Murfreesboro Pike in Nashville at 6:00 p.m. in order to exchange custody of their five-month-old son, A.G. (We will refer to the child by his initials). Defendant had custody of A.G. that day, and the victim was supposed to pick him up. The victim also had her two daughters, K.B. and A.B with her. (We will also refer to the victim's minor daughters by initials.) The victim testified that Defendant was not in the parking lot when she arrived shortly before 6:00 p.m. When he failed to

arrive by the agreed upon time, she called police and asked them to come to the scene. The victim testified that Defendant never texted or told her that he would be late, and he had previously told her that he might or might not bring A.G. back to her.

Defendant arrived in the parking lot a short time later, and the victim told him that she had called police. Defendant told her that he would wait for them, and he brought A.G. over to her car. The victim testified that Defendant then told her that he had court-ordered visitation with A.G., and he threatened to have her arrested for violating the order. The victim said that she followed Defendant to his car. She stood outside looking at the alleged "visitation" papers while he sat inside. Suddenly, Defendant hit her in the face with his closed fist as he got back out of the car. The victim testified that she turned to run, and Defendant hit her a second time in the back of the head, and she fell to the ground. She heard her two daughters screaming and crying, and one of her daughters called 911. The victim testified that two men helped her up, and one of them took the phone from her daughter and gave the 911 operator the correct information about their location. The victim also spoke with the 911 operator. Defendant then got into his car and left the scene. An officer arrived within five minutes. He took pictures of the victim who had cuts on each side of her nose where she had been wearing glasses when Defendant struck her. A recording of the 911 call was played for the jury, and the victim identified the voices on the recording as that of her daughter, an unknown man at the scene, and herself. Defendant and his mother came back to the scene after police arrived. An ambulance also came to the scene, but the victim was not transported to the hospital. The victim testified that she and Defendant had dated "on and off" for approximately thirteen years, but they never lived together.

On cross-examination, the victim testified that she had told Defendant by email that she would call police if he failed to arrive on time to meet her in the parking lot, and he did not respond indicating that he might be late. The victim testified that Oct. 12, 2014, was the first time that she and Defendant had met to exchange custody of A.G., and there was no prior history of him being late. The victim testified that she followed Defendant to his car. She was looking at the "visitation" papers, and she was standing between Defendant and the open car door. She denied striking Defendant in the face before he hit her or that she had "snatched" the papers out of his car. The victim testified that she had not been the initial aggressor in past arguments or physical altercations between her and Defendant. The victim admitted that approximately six months after this incident, she and Defendant had resumed a sexual relationship, but it had ended by the time of trial.

Frankie Churchwell testified that she was at the Kroger store on October 12, 2014, and she called 911. A recording of the call was played for the jury. Ms. Churchwell did not recall anything independent of the call, and she did not know anyone involved in the altercation. On cross-examination, Ms. Churchwell could not recall if she actually saw a

man hit a woman and knock her to the ground or if the other man at the scene told her what happened.

K.B., the victim's thirteen-year-old daughter, testified that she knew Defendant because he dated her mother. On October 12, 2014, she saw the victim "running like trying to get back to the car and trying to call 911 and like her crying a little bit." K.B. thought that the victim was trying to get away from Defendant, and K.B. called 911. A recording of the call was played for the jury. She saw Defendant hit the victim in the face and the victim fall to the ground. K.B. testified that Defendant hit the victim with his fist, and her face was bleeding. She said that two men came to help the victim, and one of the men took the phone from her while she was talking to the dispatcher. The other man helped calm her and her sister.

On cross-examination, K.B. testified that the victim got out of her car after A.G. was placed inside the car and followed Defendant to his car. She noted that Defendant had said something about "papers," and the victim walked over to see them because she was confused. K.B. testified that she never saw the victim reach for the papers and that Defendant handed them to her. She said that Defendant hit the victim as she turned around to give the papers back to him. K.B. thought that Defendant struck the victim two or three times and that he kicked her as she was getting up.

A.B., the victim's twelve-year-old daughter, testified that she looked out the car window on October 12, 2014, and saw Defendant hit the victim and the victim fall to the ground. A.B. got out of the car to help the victim while K.B. called 911. She said that the victim had a cut on her nose from her glasses.

On cross-examination, A.B. testified that Defendant brought A.G. to the car, and K.B. buckled him into his car seat. She said that the victim then walked over to Defendant's car but she did not reach inside and that Defendant gave papers to the victim. A.B. testified that the victim was standing next to Defendant's car when he struck her.

Officer Thomas Barnes of the Metropolitan Nashville Police Department testified that he was dispatched to the Kroger parking lot on October 12, 2014, in response to a domestic disturbance. Fire department personnel were already on the scene treating the victim's injuries. The victim, who was "shaken up," told Officer Barnes that she was assaulted during a child custody exchange, and she had two cuts on either side of her nose. She said that Defendant struck her while she was wearing glasses. Officer Barnes testified that Defendant was not present when he first arrived but Defendant later returned with his mother, and Officer Barnes spoke with him. He said:

> [Defendant] told me that himself [sic] and the victim was [sic] in a verbal argument over child custody issues. He said at one point that the argument lead [sic] in, he was sitting in his vehicle, looking over paperwork associated with the child custody, he said that the victim

reached into the vehicle and struck him in the left cheek with an elbow reaching for the paper.

Officer Barnes testified that Defendant admitted to striking the victim with his fist. It was his understanding that Defendant was still inside his car when he struck the victim. He noted that Defendant's mother arrived first and called Defendant, and he came back to the scene. Defendant said that he left the scene because two men there had threatened him.

Defendant testified that A.G. was four months old when the incident occurred. He said that he had "standard visitation" with the child that consisted of every other weekend and some Wednesdays. He said that he was paying child support, and the victim had agreed, in front of a magistrate, to allow him to see A.G. anytime he wanted to. Defendant testified that he agreed to meet the victim in the Kroger parking lot to return A.G. to her; however, he was running a little late. He said that he emailed the victim prior to 6:00 p.m. and told her that he would be approximately fifteen minutes late. Defendant testified that at 5:50 p.m., the victim emailed back and said that she had already called police. Defendant arrived in the parking lot at approximately 6:10 p.m. and pulled around to the front of the victim's car. He said that he got out of the car and placed A.G. in the victim's car.

Defendant testified that he walked back to his car to wait for police to arrive, and the victim followed him to the car. After he sat down in the car, the victim stood between him and the open door. He said that the victim kept asking him, "where are the papers, where are the papers?" Defendant testified that the victim then reached inside his car and grabbed the papers from the dash, and she struck him in the face with what he thought was her elbow. Defendant said that he "slapped" the victim knocking her to the ground which caused the cuts on her nose. He said that he hit the victim one time, and he denied kicking her. Defendant testified that he was trying to get the victim "off" of him until police arrived. He said that he drove away because two men said that they were going to "kick [his] a[- - ]" for putting his hands on a woman. Defendant testified that he voluntarily came back to the scene and spoke to police. He said that the victim was the initial aggressor and that she had been the initial aggressor against him many times in the past and that she has "an anger issue."

On cross-examination, Defendant testified that he had a bruise on his face after the victim elbowed him. He said that he slapped the victim but did not hit her directly in the face. Defendant did not know if one of the men who threatened him was the same as the one heard on the 911 call. Defendant admitted that he had a history of violence.

Allery Phelps is a friend of Defendant, and he knows the victim. He said that he had seen the victim be the initial aggressor on at least two prior occasions. Mr. Phelps testified that he had observed the victim "slap [Defendant] in a rage of anger, [and] swing at him with umbrellas." He said that the victim had hit him as well. Mr. Phelps testified

- 4 -

that Defendant did not hit the victim and that Defendant "just pushed and defended hi[m]self." He said that he had observed aggressive behavior by the victim many times.

Joan Mitchell testified that her husband and Defendant are friends, and she has known the victim for approximately ten years. The victim and Defendant had been to her home, and she had seen the victim act violently toward Defendant. Ms. Mitchell testified that she had observed the victim be the initial aggressor toward Defendant more than five times. She said that she told the victim many times to stop coming over if she was going to be violent. Ms. Mitchell testified that she had seen the victim "[s]mack [defendant], punch him, grab him by his face like he was a child, [and] push him in the head." She never saw Defendant hit the victim. Ms. Mitchell testified that on one occasion, the victim "smacked [Defendant] on the porch and it broke the cigar that he had in his mouth and she got mad about some money and I think he gave her an amount, but it was less than what she was looking for and she got upset and smacked him." Ms. Mitchell further testified that the victim had hit Defendant with her fist and open hand and that the victim was "always physical."

*Analysis*

Defendant argues that the evidence in this case was insufficient to support his conviction for domestic assault because he was defending himself against the victim who was the initial aggressor. We disagree.

When an accused challenges the sufficiency of the convicting evidence, our standard of review is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The trier of fact, not this court, resolves questions concerning the credibility of the witnesses, and the weight and value to be given the evidence as well as all factual issues raised by the evidence. *State v. Tuttle* 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995). Nor may this court reweigh or reevaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. *Id*. Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of [the] evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011). In a bench trial, as was this case, the verdict of the trial court is reviewed the same as a jury verdict. *State v. Holder*, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999).

Assault occurs when a defendant intentionally, knowingly, or recklessly causes bodily injury to another person; intentionally or knowingly causes another person reasonably to fear imminent bodily injury; or intentionally or knowingly causes physical

contact with another person and a reasonable person would regard the contact to be extremely offensive or provocative. T.C.A. § 39-13-101(a)(1)-(3). Assault committed when the defendant and the victim "are dating or who have dated or who have or had a sexual relationship" is domestic assault. T.C.A. § 39-13-111(a) (2010). "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." T.C.A. § 39-11-106(2).

The evidence, viewed in the light most favorable to the State, shows that on October 12, 2014, the victim and Defendant, who had dated "on and off" for thirteen years, met in the parking lot of the Kroger on Murfreesboro Pike to exchange custody of their five-month-old son. At some point, while the victim was standing at Defendant's car looking over some papers that Defendant purported to be custody papers, Defendant struck the victim in the face with his closed fist causing her glasses to cut both sides of her nose. The victim testified that she turned to run and Defendant hit her a second time in the back of the head, and she fell to the ground. The victim's two young daughters witnessed Defendant strike the victim with his fist, and one of them called 911. Another bystander, Frankie Churchwell, also called 911 concerning the altercation. The victim denied striking Defendant in the face before he hit her or that she was attempting to take the papers from Defendant's car. Both of the victim's daughters testified that they saw Defendant hand the papers to the victim before he hit her in the face.

Defendant admitted to Officer Barnes that he struck the victim with his closed fist. However, at trial Defendant testified that he slapped the victim knocking her to the ground which caused the cuts to her nose. He denied hitting her directly in the face. Defendant also claimed that the victim was the first aggressor and that she struck him in the face with what he thought was her elbow while she was reaching inside his car for the papers. He further claimed that he was trying to get the victim "off" of him until police arrived. Defendant also called two other witnesses at trial to testify that the victim had been the initial aggressor against him in past arguments.

The trial court in this case credited the testimony of the State's witnesses and rejected Defendant's claim of self-defense as was its prerogative. At the conclusion of the bench trial, the trial court held:

> The Court is of the opinion based on all of the testimony that I have heard including the two daughters, the alleged victim, all of the other people that testified, as well as [Defendant], and his two witnesses, that the State has carried its burden and it has proven that this defendant without it being self-defense slapped this woman or punched this woman, whichever way you want to look at it, causing those injuries and the Court therefore finds this man guilty of domestic assault and that is the judgment of the Court.

Issues of witness credibility are questions for the trier of fact, and this court does not second-guess the weight, value, or credibility afforded to the evidence by the trier of fact. *State v. Gregory Mullins*, No. E2004-02314-CCA-R3-CD, 2005 WL 2045151, at \*5 (Tenn. Crim. App., at Knoxville, Aug. 25, 2005). Whether or not a defendant acted in self-defense is a question for the trier of fact to determine. *See Arterburn v. State*, 216 Tenn. 240, 391 S.W.2d 648, 653 (Tenn. 1965); *State v. Fugate*, 776 S.W.2d 541, 545 (Tenn. Crim. App. 1988). Encompassed within that determination is whether the defendant's belief in imminent danger was reasonable, whether the force used was reasonable, and whether the defendant was without fault. *State v. Renner*, 912 S.W.2d 701, 704 (Tenn. 1995).

Based upon the evidence, we conclude that a rational trier of fact, which in this case was the trial judge, could find beyond a reasonable doubt that Defendant committed the offense of domestic assault. Thus, Defendant is not entitled to relief on this issue.

## CONCLUSION

After a thorough review of the record and applicable law, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, PRESIDING JUDGE