IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 14, 2004

## STATE OF TENNESSEE v. PHILANDER T. FLEMING

**Direct Appeal from the Criminal Court for Shelby County**
**No. 02-05090     Chris Craft, Judge**

---

**No. W2003-02547-CCA-R3-CD  - Filed March 21, 2005**

---

The appellant, Philander T. Fleming, was convicted by a jury in the Shelby County Criminal Court of voluntary manslaughter. The trial court sentenced the appellant to nine years incarceration in the Tennessee Department of Correction. On appeal, the appellant challenges the trial court's ruling on his motion to suppress and the sufficiency of the evidence supporting his conviction. Upon our review of the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and ALAN E. GLENN, J., joined.

James M. Gulley (at trial and on appeal) and Kevin Balkwill (at trial), Memphis, Tennessee, for the appellant, Philander T. Fleming.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; and Glen Baity, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### I.  Factual Background

The appellant was originally charged with second degree murder in relation to the shooting death of the victim, Eric Obie, on March 19, 2002, at 216 East McLemore. Prior to trial, the appellant filed a motion to suppress, contending that his statement to police implicating himself was made without the appellant being apprised of his Miranda rights.[1] A suppression hearing was held on the appellant's motion.

---

[1]  See Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966).

## A. Motion to Suppress

The only witness to testify at the appellant's suppression hearing was Sergeant James L. Fitzpatrick with the Memphis Police Department Homicide Division. Sergeant Fitzpatrick testified that as a result of an investigation, the appellant became a suspect in the murder of the victim. Accordingly, the appellant was arrested on March 29, 2002, and he was brought to the homicide office at approximately 9:30 or 10:00 a.m. While he was there, the appellant was offered food, drink, and the use of the washroom.

Prior to formal interviewing, the appellant began asking about his vehicle, which had been towed around the time of his arrest. Sergeant Fitzpatrick and the appellant talked about the location of the vehicle for a while. Additionally, they talked about mutual acquaintances. At 11:15 a.m., before the conversation turned to the homicide, Sergeant Fitzpatrick advised the appellant of his Miranda rights, and the appellant signed a waiver of rights form. Sergeant Fitzpatrick stated that the appellant had completed the tenth grade and appeared to have no difficulty understanding his rights. Moreover, there was no indication that the appellant was under the influence at the time he signed the waiver. Sergeant Fitzpatrick recalled that the appellant indicated that "he would be more than happy to [make a statement] because at that point and time he was quite congenial."

Sergeant Fitzpatrick testified that the appellant never requested an attorney. Additionally, Sergeant Fitzpatrick recalled that the appellant was not deprived of food or drink, nor was he handcuffed at the homicide office. Further, Sergeant Fitzpatrick stated that no promises or threats were made to the appellant. The appellant was not under physical or mental coercion. The appellant signed his statement at the conclusion of the interview at 3:15 p.m.

In the order denying the appellant's motion to suppress, the trial court found:

> The only witness at the hearing was officer Fitzpatrick, who testified that he interviewed the [appellant] after he had been brought to the police department interview room at the homicide office in downtown Memphis. The [appellant] was offered food and drink, but declined. The officer determined that he had a 10th grade education, and had no problem reading or writing. He signed a waiver of rights form . . . at 11:18 a.m. that day and gave a 6 page typed, detailed statement of admission . . . which he signed at 2:15 p.m. According to the officer, the only questions he had were concerning his car being towed after his arrest. This Court therefore finds that the [appellant] waived his rights freely and voluntarily, and sees no reason to suppress his statement to the police.

Subsequently, a trial was commenced.

## B. Trial

At trial, Cortney Murese Gordon, a friend of the victim, testified that he arrived at a club, the Hard Luck Café located at 216 East McLemore, at 12:30 or 1:00 am. in the early morning hours of March 19, 2002. At approximately 2:00 a.m., Gordon noticed the victim leaving the club to move his vehicle. Gordon walked outside with the victim. He explained, "It was our partner's birthday; everybody had been drinking." Due to the crowed nature of the parking lot, the victim was unable to move his vehicle. Gordon and the victim then stood together outside by the victim's vehicle, talking. Gordon stood facing the street, and the victim stood with his back to the street.

Gordon saw someone in a gray hood coming toward them from the street. Gordon testified that, thereafter, he heard six or seven gunshots. He asserted, "I seen the dude. First, I didn't know where the shot was coming from until I seen the fire, seen the dude with the hood over his face." Gordon lamented that he did not see the shooter's face, but he described the shooter as being a little over six feet tall, weighing two hundred pounds. Gordon stated that he did not see the victim get shot; however, he saw the victim falling. The victim landed flat on the ground, "wiggling" and "shaking." The shooter walked toward a black car and got into the back seat. Gordon stated that when the car pulled up, it seemed "like it was planned."

Gordon testified that police arrived and placed him in the back of a police car. Then, the paramedics arrived. Gordon woke up later that morning in an interrogation room. He informed the police that he had drunk four to five beers over the course of the evening. Police did not want to question Gordon while he was intoxicated; therefore, Gordon was released. He returned to the police station one or two days after the shooting and gave a full statement to police.

Dewayne Mullins testified that he was working security for the Hard Luck Café on the morning of the shooting. He saw the victim and someone he could not identify get into a "verbal altercation" in the club. The victim called the man names, but the man just walked away. The victim was removed from the club for causing the altercation. Mullins recalled that he never saw the face of the man to whom the victim was talking. However, he saw the man's clothing and hairstyle, which hairstyle "looked like he had dreads, or he end up taking some braids down or something like that."

At closing time, Mullins was coming out of the club when he heard gunshots. He saw the man with the dreads wearing a gray or black hood. The man dropped what looked like a pistol, picked it up and put it in a pocket. "I mean, very nonchalantly picked it up, put it back in there and backed up – continued to back up to – to a car that was coming."

Gerald Ivory, a security officer, testified that he was working at the Hard Luck Café in the early morning of March 19, 2002. He recalled that at approximately 2:30 a.m., he saw the victim and the appellant have a "little altercation." The victim called the appellant a "bitch" and pushed him a little. Ivory escorted the victim out of the club. He observed that the victim was intoxicated, but he carried no weapons.

At approximately 3:15 a.m., the club began to close. As Ivory was walking toward the door, he heard six or seven gunshots. Ivory ran outside and saw the appellant. "When I saw him, he was backing away [from the victim]. He dropped something and he picked it up. I actually didn't see what it was. He kind of stuck it back in his hooded top he had on and . . . got into a vehicle [on the passenger side]." Ivory explained that the appellant had "casually walked away" from the victim. Ivory testified that he later identified the appellant as the shooter from a photographic lineup prepared by police.

Sergeant William Woodard with the Memphis Police Department testified that Gordon was brought to the police station immediately after the shooting. Gordon stated that he was not standing near the victim at the time of the shooting. He saw someone take off in a black car just after the shooting. Sergeant Woodard explained that Gordon was "in an agitated state" at the time he denied knowing anything about the case. Sergeant Woodard also explained that it was not unusual for a witness to hesitate about coming forward to the police after a crime.

Lieutenant Darrell L. Sheffield with the Memphis Police Department testified that he was involved in the investigation of the homicide. Through an investigation, police developed the appellant as a suspect. Thereafter, Lieutenant Sheffield located a black late 1980's model Pontiac Bonneville that was owned by the appellant. The vehicle was found at Coleman's Body Shop.

Lieutenant Sheffield stated that the initial statement Gordon gave to police did not comport with the physical evidence at the scene. Lieutenant Sheffield interviewed Gordon again, and, during the second interview, Gordon relayed events similar to those in his trial testimony. Lieutenant Sheffield opined that Gordon's second statement comported much more closely with the physical evidence.

Sergeant Fitzpatrick testified that the appellant gave a statement to police regarding the shooting. The appellant told police that he was the one responsible for shooting the victim. The appellant stated that he had the gun only one or two days prior to the shooting. After leaving the club, he obtained the gun from under the passenger seat of his car, a black, four-door 1986 Bonneville. The appellant recalled that while he was at the Hard Luck Café on the evening in question, the victim "walked up on me and said 'move bitch', but I just moved out of his way and let him go on by and didn't have no confrontation with him." Later, the victim "bumped" into the appellant again, and the appellant told security that the victim had been bothering him. Security escorted the victim out. The appellant decided to leave the club, and he got into his car. After seeing someone he knew, he got out of the car with the gun in his pocket to speak with her. Realizing that he was mistaken as to the female's identity,

> I turned around and started towards my car and I heard someone
> holler "get that bitch ass nigger or something like that", so when I
> looked around seemed like he was running towards me, I don't know
> if he had a gun or a knife or a beer bottle, I was scared so when I
> turned around I aimed the gun towards the ground and shot three or

-4-

four times. I was not trying to kill him, I don't know him and I had
no intentions of killing no one ever in my life.

After the shooting, the appellant went to his car, which a friend was driving, and they "just pulled off." The appellant threw the gun out of the window as they were driving down the street.

Dr. Teresa Allen Campbell performed an autopsy on the victim's body. She stated that the victim had three gunshot wounds. Gunshot wound A, located on the upper front of the victim's right thigh, was the exit wound for gunshot wound B, which was located on the victim's right back upper hip. The bullet traveled through the victim's body and did "not hit anything of significance." Gunshot wound C entered the victim's left lower back near the side, below the belt line. The bullet traveled through skin, fat, and muscle before going through the left hip bone. Dr. Campbell testified that the bullet then proceeded

into a big muscle in lower abdomen. Enters the lower abdomen and perforates the aorta near the very bottom of the aorta. The aorta is a very large blood vessel that originates from the heart and goes all the way down your chest and your abdomen with branches coming off of it. So the bullet perforates the – the aorta. It grazes the colon. And then it perforates the small bowel twice.

And at that point, the bullet – there is a defect noted in the peritoneum which is the lining of the abdominal cavity. What happened is the bullet hit that spot, but it did not have enough energy left to exit out the abdomen. It would have exited a little bit over here to the right if it had. But it hit the peritoneum, did not exit, ran out of energy and just – it was just floating loose in the abdomen.

Dr. Campbell testified that gunshot wound C "was the immediate cause of death," but the official cause of death was multiple gunshot wounds.

Dr. Campbell explained that gunshot wound C caused the victim to bleed to death. There were "2800 cc's" of blood in the victim's abdominal cavity, which was "at least half of his blood volume or a little more." She theorized that the victim probably did not bleed much because there was no exit wound for gunshot wound C. Dr. Campbell opined that due to the lack of stippling, searing, or soot, the shooting occurred from a distance of three feet or greater. She testified that the victim's blood alcohol content was .227, more than twice the legal limit.

Based upon the foregoing proof, the jury convicted the appellant of the lesser-included offense of voluntary manslaughter. The trial court sentenced the appellant as a Range II multiple offender to nine years incarceration. On appeal, the appellant contests the trial court's ruling on his motion to suppress and the sufficiency of the evidence supporting his conviction.

## II. Analysis

### A. Motion to Suppress

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the State, as the prevailing party, is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23.

Generally, the Fifth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution provide a privilege against self-incrimination to those accused of criminal activity, making an inquiry into the voluntariness of a confession necessary. See State v. Callahan, 979 S.W.2d 577, 581 (Tenn.1998). However, if an accused is informed of his Miranda rights and knowingly and voluntarily waives those rights, he may waive the privilege against self-incrimination. Id. (citing Miranda v. Arizona, 384 U.S. 436, 444-45, 479-78, 86 S. Ct. 1602, 1612, 1630 (1966)). Additionally, the trial judge's findings of fact at the motion to suppress hearing are accorded the weight of a jury verdict. See State v. Tate, 615 S.W.2d 161, 162 (Tenn. Crim. App. 1981). Accordingly, the trial court's decision is binding upon this court if the decision is supported by a preponderance of the evidence. See Odom, 928 S.W.2d at 22-23.

This court must consider "the totality of the circumstances to determine whether the confession is admissible." State v. Grady E. Shoffner, No. 03C01-9403-CR-00113, 1995 WL 382628, at *3 (Tenn. Crim. App. at Knoxville, June 27, 1995) (citing State v. Kelly, 603 S.W.2d 726, 728-29 (Tenn. 1980)). Accordingly, we consider the following factors in determining the voluntariness of a confession: the appellant's age; education or intelligence level; previous experience with the police; the repeated and prolonged nature of the interrogation; the length of detention prior to the confession; the lack of any advice as to constitutional rights; the unnecessary delay in bringing the appellant before the magistrate prior to the confession; the appellant's intoxication or ill health at the time the confession was given; deprivation of food, sleep, or medical attention; any physical abuse; and threats of abuse. See State v. Huddleston, 924 S.W.2d 666, 671 (Tenn. 1996). Furthermore, this court has stated:

> Coercive police activity is a necessary prerequisite in order to find a confession involuntary. The crucial question is whether the behavior of the state's officials was "such as to overbear [the appellant's] will to resist and bring about confessions not freely self-determined." The question must be answered with "complete disregard" of whether or not the accused was truthful in the statement.

State v. Phillips, 30 S.W.3d 372, 377 (Tenn. Crim. App. 2000) (citations omitted).

It appears that the crux of the appellant's complaint is that Sergeant Fitzpatrick spoke with him for one and one-half to two hours prior to the formal interview, without apprising him of his Miranda rights. He claims that a "valid waiver of [his] rights did not occur merely because he eventually acquiesced to the interrogation by Sergeant J.L. Fitzpatrick which occurred after three hours of casual conversation with the Sergeant." The facts at the suppression hearing revealed that the appellant was arrested at 9:30 or 10:00 a.m. on March 29, 2002, and he was immediately brought to the police station. The appellant and Sergeant Fitzpatrick engaged in casual conversation until 11:15 a.m. when the appellant was apprised of his rights.

It is well-established that the entitlement to Miranda protections is limited to situations involving custodial interrogation or its functional equivalent. See State v. Jimmy Albert Warren, No. W2004-00107-CCA-R9-CD, 2004 WL 3140905, at *5 (Tenn. Crim. App. at Jackson, Dec. 15, 2004), application for perm. to appeal filed, (Feb. 14, 2005). It is unquestioned that the appellant was in custody as a result of his arrest at 9:30 or 10:00 a.m. that morning. Thus, we must next determine at what point the appellant was subject to an interrogation or its functional equivalent.

Our supreme court has recently noted that "[i]nterrogation 'refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" State v. Charles Sawyer, __ S.W.3d __, No. M2002-01062-SC-R11-CO, 2005 WL 434788, at *3 (Tenn. at Nashville, Feb. 25, 2005) (quoting Rhode Island v. Innis, 446 U.S. 291, 298, 100 S. Ct. 1682, 1689-90 (1980)). Additionally, interrogation consists of "any 'practice that the police should know is likely to evoke an incriminating response from a suspect.'" Id. However, "[t]here is a difference between police initiated custodial interrogation and communications, exchanges, or conversations initiated by the accused himself." State v. Land, 34 S.W.3d 516, 524 (Tenn. Crim. App. 2000). Such communications, when initiated by the accused, are "not interrogation in the Innis sense." Id. In order to constitute an interrogation, "the police must have asked a question that was 'probing, accusatory, or likely to elicit an incriminating response' before a court may conclude that there was interrogation." Id.

Unfortunately, the record does not reflect whether the appellant was given Miranda warnings at the time of his arrest. Regardless, the appellant was not questioned or prodded into revealing inculpating information prior to 11:15 a.m. when the interview began and the appellant was informed of his rights. Accordingly, the appellant was not constitutionally entitled to his rights before that time. Sergeant Fitzpatrick testified that the appellant was read his rights before the interview in which he made incriminating statements. Specifically, Sergeant Fitzpatrick testified that he thoroughly discussed the appellant's Miranda rights with him, and the appellant subsequently signed a waiver of those rights before questioning. See State v. Carter, 16 S.W.3d 762, 767 (Tenn. 2000) (stating that proof that a defendant was made aware of his Miranda rights, although not conclusive, weighed in favor of the admission of a confession into evidence). The trial court found that the appellant was thoroughly aware of his rights before he made his confession. As there is no evidence

to the contrary, we see nothing in the record to preponderate against the findings of the trial court. Therefore, the appellant's confession was admissible.

## B. Sufficiency of the Evidence

Next, the appellant challenges the sufficiency of the evidence supporting his conviction for voluntary manslaughter. On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no "reasonable trier of fact" could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

Tennessee Code Annotated section 39-13-211(a) (2003) provides, "Voluntary manslaughter is the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b) (2003). Moreover, a determination of whether there existed "adequate provocation" is left to the jury. See State v. Johnson, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995).

The appellant specifically complains that

> [t]he proof offered by the State is primarily composed of the testimony of a biased witness, Mr. Cortney Gordon, and an inconclusive report by the medical examiner as to the position of the victim's body at the time it was shot which would indicate if the [appellant] did or did not act in self-defense.

The appellant asserts that Gordon was not a credible witness because he gave different versions of the events to police and because he was a friend of the victim. The jury was made aware that Gordon initially denied any knowledge of the offense. However, Sergeant Woodard testified that it was not unusual for a witness to initially refuse to assist police. Lieutenant Sheffield testified that Gordon's second statement to police comported with the physical evidence. Additionally, Gordon's testimony of events was corroborated by Ivory and Mullins and to some degree by the appellant's own statement. It was within the jury's purview to accredit or discredit Gordon's

testimony. In the instant case, the jury clearly chose to believe Gordon and the remainder of the State's witnesses.

The appellant did not deny shooting the victim. He merely alleged that he had done so in self-defense. Self-defense is essentially a fact question for the jury. See State v. Clifton, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994); State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). As such, "in the context of judicial review of the jury verdict, in order to prevail, the [appellant] must show that the evidence relative to justification, such as self-defense, raises, as a matter of law, a reasonable doubt as to his conduct being criminal." Clifton, 880 S.W.2d at 743. In determining whether an appellant acted in self-defense, a jury must determine "whether the [appellant's] belief in imminent danger was reasonable, whether the force used was reasonable, and whether the [appellant] was without fault." State v. Thomas Eugene Lester, No. 03C01-9702-CR-00069, 1998 WL 334394, at *2 (Tenn. Crim. App. at Knoxville, June 25, 1998). In the instant case, the only evidence of self-defense was the appellant's self-serving statement to police that he thought the victim was charging him with a gun, knife, or beer bottle, prompting the appellant to shoot. Obviously, in convicting the appellant of voluntary manslaughter, the jury discounted the appellant's claim of self-defense. See State v. Fugate, 776 S.W.2d 541, 545-46 (Tenn. Crim. App. 1988). This finding is entirely within the province of the jury. See State v. Robert Gillespie, No. 03C01-9710-CC-00455, 1999 WL 74252, at *3 (Tenn. Crim. App. at Knoxville, February 17, 1999). There was more than ample evidence to sustain the appellant's conviction for voluntary manslaughter, especially in light of the fact that the victim was shot twice in the back.

### III. Conclusion

Finding no error, we affirm the judgment of the trial court.


_____
NORMA McGEE OGLE, JUDGE