## IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

### AT KNOXVILLE

### APRIL 1998 SESSION



FILED

September 9, 1998

**Cecil Crowson, Jr.**
Appellate Court Clerk

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | |
| | ) | |
| Appellee, | ) | C.C.A. No. 03C01-9706-CR-00197 |
| | ) | |
| vs. | ) | Hamilton County |
| | ) | |
| **RAY ANTHONY NELSON,** | ) | Hon. Stephen M. Bevil, Judge |
| | ) | |
| Appellant. | ) | (Second Degree Murder) |
| | ) | |

FOR THE APPELLANT:

**ARDENA J. GARTH**
District Public Defender

**DONNA ROBINSON MILLER** (on appeal)
**KARLA M. GOTHARD** (at trial)
Asst. District Public Defenders
701 Cherry St., Ste. 300
Chattanooga, TN 37402

FOR THE APPELLEE:

**JOHN KNOX WALKUP**
Attorney General & Reporter

**ELLEN H. POLLACK**
Asst. Attorney General
425 Fifth Ave. N., 2d Floor
Nashville, TN 37243-0493

**WILLIAM H. COX, III**
District Attorney General

**REBECCA A. STERN**
**BATES BRYAN**
Asst. District Attorneys General
600 Market St., Ste. 310
Chattanooga, TN 37402

OPINION FILED:_____

**AFFIRMED**

**CURWOOD WITT, JUDGE**

## OPINION

The defendant, Ray Anthony Nelson, appeals his conviction of the second degree murder of Ester L. Williams.[1] He received his conviction in the Hamilton County Criminal Court at the conclusion of a trial by a jury of his peers. In this direct appeal, he raises the following issues for our review:

1.  Whether the evidence sufficiently supports his conviction.

2.  Whether the trial court erred in admitting evidence of his prior abuse of the victim.

3.  Whether the trial court erred in allowing Sister Suzanne Repasky to testify as an expert witness on domestic violence.

4.  Whether his sentence of 25 years is excessive.

Following a review of the record and the briefs of the parties, we affirm the judgment of the trial court.

The defendant and the victim were not married and lived together in an apartment in a Chattanooga housing project. Their relationship of approximately thirteen years was marred by domestic violence, which culminated with the victim's death at the hands of the defendant in December 1994. Following the victim's death, the defendant was indicted for first degree murder and ultimately convicted of second degree murder. This appeal followed.

The state's proof showed that the victim and the defendant lived together for several years, part of the time in Ohio and part of the time in Tennessee. The victim's two adult daughters both testified to having witnessed prior instances of the defendant's physical abuse of the victim. A Chattanooga mental health worker testified to a history of domestic violence in the victim's and the defendant's home. A neighbor, Mack Smith, testified that he regularly heard

_____

[1] The victim's name is spelled inconsistently in the record. We use it as it appears in the indictment.

2

noises from the victim's and the defendant's apartment that sounded like the defendant beating the victim and that he heard screaming and crying every night since the defendant's arrival at the apartment. He testified the defendant was "an awfully strong fellow."

Sister Suzanne Repasky, a Catholic nun, testified that she works as a counselor at the Battered Women Shelter in Akron, Ohio. Sister Repasky came into contact with the victim through the shelter. When the victim came to the shelter in October 1992, her face was scarred and bruised and she had trouble walking. She told one of the counselors that she had been beaten with a pipe by her boyfriend. Someone found her lying in a parking lot and took her to the hospital. Hospital personnel referred the victim to the shelter. Sister Repasky testified that the victim came back to the shelter on two occasions. When she left the last time, she reported that she was going to Tennessee. A follow up call was made three months later, and the victim's mother reported that the victim was doing well.

Sister Repasky testified that according to F.B.I. statistics, 50 percent of women in relationships will be hit at least one time. Additionally, there is abuse in 25 percent of American households. According to research in the field, 90 to 95 percent of abused individuals are women. Sister Repasky also said that it is somewhat typical for abused women to make up reasons other than abuse for their injuries. They are embarrassed, feel guilty and blame themselves for their plight. When asked whether this proposition applied to abused men, as well, Sister Repasky said that she did not have enough knowledge of abused men to say whether they make up reasons for their injuries.

Detective Mike Mathis of the Chattanooga Police Department was dispatched to the victim's home on December 21, 1994. He narrated a video of the

3

crime scene for the jury. He found no sign of forced entry. The victim's body was in the bedroom in a chair. She was on top of some newspapers, which had no blood on them. However, there was blood under the newspapers on the seat of the chair. Detective Mathis admitted, however, that to his knowledge the "blood" was never tested. The body was not very stiff, and Det. Mathis opined that it was in the late stages of rigor mortis. Men's clothes with what appeared to be blood on them were found lying on a closet floor. Additionally, a pillow, sheet, towel and washcloth had a red substance on them. There was a clipboard on the dresser with notes written to various individuals. Apparently, these notes were written to members of the victim's and the defendant's families by the defendant to apologize for and/or explain the victim's death. The notes were signed "Ray."

As a result of the investigation, the police suspected the defendant and had an arrest warrant issued. Thereafter, Det. Mathis learned that the defendant had turned himself in to authorities in Birmingham, Alabama. Detective Mathis and Sgt. Jeff Francis interviewed the defendant in the Jefferson County, Alabama jail on Friday, December 29, 1994.[2] The defendant told the officers that he came home from work on Monday evening[3] and had an argument with the victim because he wanted a dollar to buy some cigarettes. The defendant asked the victim to get some money from relatives who owed her money so he could buy the cigarettes. They went to see the relatives but were unsuccessful in getting any money.

An argument ensued when they got home. There had been a lot of arguing recently over money. The argument escalated to yelling and screaming.

---

[2]This court judicially knows that December 29, 1994 was a Thursday.

[3]This court judicially knows that the Monday prior to December 21, 1994 (the date on which the victim's body was discovered) was December 19.

4

During the argument, both the victim and the defendant claimed to have other love interests. The victim started to pick up a television set to throw at the defendant, but the defendant was able to get it away from the victim. The defendant snapped, and a physical fight ensued, although the victim did not really fight back. The victim was "meaner" than usual. Although the defendant had been able to control his anger in the past, he was unable to do so on this occasion. He had the victim on the floor next to the bed, and he was on top of her using his knee and placing it on different parts of her torso. There was blood coming from her face, mouth and nose. The defendant realized the victim was not able to breathe. He stopped the assault and began to hold her. He said first he thought she was unconscious, and later, he said he thought she was dead. The defendant implied to the officers that he did not realize how seriously the victim was hurt until he saw her bleeding and not breathing. In the statement, the defendant said he cleaned the victim's body and took off her clothing. He placed the body in a recliner. He sat in the chair with the body during the night and held it.

The next morning, the defendant decided to leave. He covered the victim's body with blankets and placed newspapers under it. He started out on foot in Chattanooga, and he eventually caught a ride with an elderly gentleman who bought him a bus ticket to Birmingham. He stayed in shelters in Birmingham and disposed of some clothing and his key to the victim's apartment.

The defendant told the officers that he had lived with the victim off and on since 1982. Their relationship had been riddled with fights and problems. He showed the officers scars from altercations in which the victim stabbed and cut him. Nevertheless, the defendant claimed to have loved the victim and put up with this.

The defendant made it clear to the officers that he was the only one

involved in the victim's death. He cried at times during the interview and said he never meant to kill her. He did not mention a "code word" the victim used which indicated she was going to get a knife.

Doctor Frank King, the Hamilton County Medical Examiner, performed an autopsy of the victim's body and determined that she died as a result of blood loss and respiratory insufficiency from multiple blunt trauma injuries. These injuries included contusions, abrasions, lacerations, internal hemorrhages and bone fractures. Doctor King described the overall pattern as one of a beating. The victim's body had signs of defensive injuries.

The contusions were well developed, which means that the victim may have had a period of survival between the infliction of the injury and the time of death. However, the development of the contusions could also result from continuing hemorrhaging after death. Doctor King opined that a person could live hours or even a day or so with these injuries, provided the individual had the will to continue breathing and the body maintained blood pressure. He further opined that the victim would have had "a good chance for recovery" if she had been taken to an emergency room.

In his case-in-chief, the defendant took the stand. He testified that he was 41 years old. He met the victim in 1981, and he began living with the victim and her daughters that year. Their relationship became troubled a few years later when the victim's daughters got older and left home. The defendant fought with the victim about moral issues related to the victim's daughters and what they should be allowed to do. He testified the victim suffered from phlebitis and had a history of psychiatric problems. He admitted he had abused the victim but testified that they were both violent at times. The trial court admitted photographs of between 17 and

6

30 scars which the defendant testified were the results of cutting and stabbing injuries inflicted on him over time by the victim.

After the victim left Ohio the last time, the defendant remained in Ohio for seven months but came to Chattanooga at the victim's request to resume cohabitation with her in July 1994. The couple argued frequently about the victim's irresponsible use of money.

On the day of the victim's death, which the defendant testified was December 19, she and the defendant argued about money owed the victim by her family members. He told her he was going to leave her after the holiday. The victim said she did not care because she had another boyfriend, and the defendant responded that he had two girlfriends in Ohio and a house in which to put them.[4] The argument escalated into a physical confrontation, with the victim moving to pick up a television set. The defendant thought the victim was going to throw the television at him, and he was able to take it away from her. The victim called the defendant a name. The defendant claimed the victim used this name when she was about to assault him with a knife. The victim started toward the direction of kitchen, and the defendant thought she was going to get a knife. He grabbed her from behind and began beating her. He claimed to remember hitting her two times, then losing his memory till he looked in her eyes and saw that she was "gone." He was sure she was dead. The defendant placed the victim in a chair. He held her in his arms, rocked her, and talked to her all night. The defendant denied intending to kill the victim when he hit her. He claimed to be very remorseful over her death. The defendant went to Birmingham where he essentially lived on the streets and slept at a shelter. He decided to turn himself in and went to a municipal building

---

[4]Later in his testimony, the defendant claimed that he and the victim were going to Ohio together in January to see his mother and to get married.

and talked to the authorities.

The defendant admitted that the victim had been in a battered women's shelter in Ohio in the past. He also admitted he had probably hit her first on at least one of those occasions when she wound up in the shelter. He admitted he was in a position to get out of the bedroom when the victim reached for the television set, but he did not leave. He denied ever hitting or raping the victim with a metal pipe as reported in the victim's medical and shelter records. He claimed any injury from the alleged rape with the pipe actually resulted from consensual sex after a fight. He said no one from the shelter or hospital had ever talked to him about these allegations.

The jury found the defendant not guilty of first degree murder, but it found him guilty of the lesser offense of second degree murder.

Thereafter, the court conducted a sentencing hearing, at which the victim's daughters testified they both were unable to work due to their distress over their mother's murder. Both daughters had children who were scared and upset since the victim's death. The defendant offered character references in letter form from a fellow inmate, a childhood Sunday school teacher, two long-time friends, and a widow for whom the defendant had done home repairs. Generally, these letters attested to the defendant's uncharacteristic behavior in killing the victim, his Christian background and his willingness to help others. The trial court found two enhancement factors, (1) that the defendant had a previous history of criminal convictions or criminal behavior, and (2) that he treated the victim with exceptional cruelty during the offense. See Tenn. Code Ann. § 40-35-114(1), (5) (1997). The court found no mitigating factors. Accordingly, it imposed a sentence of 25 years.

# I

In his first issue, the defendant attacks the sufficiency of the convicting evidence. Essentially, he argues that he acted in self defense. When a defendant challenges the sufficiency of the evidence, an appellate court's standard of review is, whether after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985); Tenn. R. App. P. 13(e). This rule is applicable to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Dykes, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990).

In determining the sufficiency of the evidence, this court should not reweigh or reevaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Nor may this court substitute its inferences for those drawn by the trier of fact from the evidence. Liakas v. State, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956); Farmer v. State, 574 S.W.2d 49, 51 (Tenn. Crim. App. 1978). On the contrary, this court is required to afford the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. Cabbage, 571 S.W.2d at 835.

In pertinent part, second degree murder is "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a) (1997). The defendant freely admitted that he and he alone killed the victim. Thus, we must determine whether there is

9

sufficient evidence that the defendant acted knowingly but not in self-defense.

In the light most favorable to the state, the evidence strongly supports that the defendant acted knowingly. He engaged the victim in an argument that escalated from words to physical force. Rather than walk away when he had the chance, he stayed in the apartment and brutally assaulted the victim. He continued the assault even though the victim was not really fighting back. It is apparent from the number and severity of the injuries described by Dr. King that the assault was violent and of some duration. The injuries included blows to the head and crushing-type injuries to the chest. After the defendant incapacitated the victim, he failed to summon medical assistance which might have saved her life.

With respect to the defendant's self-defense claim, we begin our analysis by noting that self-defense is a general defense under the Criminal Code. See Tenn. Code Ann. §§ 39-11-203(a), -601, -611 (1997). But see State v. Richard Edward Brown, No. 01C01-9301-CC-00027, slip op. at 4 (Tenn. Crim. App., Nashville, Aug. 26, 1993) (characterizing self defense as an affirmative defense), perm. app. denied (Tenn. 1993). When a general defense is "fairly raised," the state must disprove its applicability beyond a reasonable doubt. Tenn. Code Ann. §§ 39-11-203(c), (d), -201(a)(3) (1997); State v. Culp, 900 S.W.2d 707, 710 (Tenn. Crim. App. 1994). Clearly, the jury found beyond a reasonable doubt that the state had met its burden. See State v. Fugate, 776 S.W.2d 541, 545 (Tenn. Crim. App. 1988) ("Whether a homicide is excusable because done in defense of person presents a classic question for jury determination.") (citations omitted). The record strongly supports the jury's conclusion. The defendant testified that the victim did not really fight back. The defendant was physically strong, and the victim had both physical and mental frailties.

10

In the light most favorable to the state, the proof fails to justify the killing of the victim and supports a conviction of murder in the second degree.

## II

In the second issue before the court, the defendant complains of the trial court's admission of evidence during the state's case-in-chief of alleged prior abuse the defendant inflicted on the victim. He generally attacks the evidence as being far more prejudicial than probative. Second, he attacks the court's ruling allowing the state to cross-examine him about his alleged vaginal and anal rape of the victim with a metal pipe and further allowing the state to offer corroborative medical and shelter records as rebuttal evidence. He claims this was a collateral issue and its admission was violative of his right to due process. The state defends admission of the alleged prior instances of non-sexual abuse during the state's case-in-chief to show motive and intent. The state also argues that cross-examining the defendant about the alleged rape was proper impeachment evidence to rebut the defendant's claims of self-defense, lack of intent to harm the victim and mistake or accident. Further, the state argues, even if the sexual assault evidence was admitted in error, it was harmless error.

In the case at bar, the court conducted a hearing on the issue of admissibility of the prior abuse evidence before the court seated the jury. The proposed evidence took two forms. First, the state planned to offer testimony of the victim's daughters and Sister Repasky. The daughters would testify about their eyewitness observations of the defendant abusing the victim and the efforts the daughters exerted to assist their mother in moving from Ohio to Chattanooga on multiple occasions to get away from the defendant. Sister Repasky would testify about her observations of the victim's injuries while the victim was at the women's shelter. Second, the state proposed to offer the records from the victim's medical

11

treatment and women's shelter stays which contained the victim's hearsay declarations about the defendant's abuse of her.

The defense specifically objected to the admission of two sets of records from Akron (Ohio) General Medical Center and the Battered Women's Shelter as proof that the defendant had abused the victim.[5] The defense contended the documentary evidence should not be admitted because (1) the defendant could not cross-examine the declarant/victim, (2) the medical records reflect the victim's statement that her assailant was "her boyfriend" without specifically naming the defendant, although "Ray Nelson, boyfriend" is listed as the victim's next of kin elsewhere in the medical records, and the victim may have had more than one boyfriend,[6] (3) the victim's alleged statements in the records did not fall into recognized hearsay exceptions, and (4) the probative value of the evidence was outweighed by the danger of unfair prejudice. Notably, the defense never specifically contended at the pretrial hearing that the victim's reports were inaccurate as to the nature of the injuries inflicted.

The trial court determined the evidence was relevant and probative of intent, identity and absence of accident. It found the medical records documenting the victim's reports of the abuse admissible under three hearsay exceptions -- excited utterance, then existing mental, emotional or physical condition, and statement for purposes of medical diagnosis and treatment. See Tenn. R. Evid. 803(2), (3), (4). On the other hand, the court found the alleged rape with the metal

---

[5]There are records from other service providers documenting reports of abusive injuries to which the defendant voiced no specific objection. In fact, the defendant requested, "[I]f the State is allowed to present certain records I would request that all of the records be introduced."

[6]In contrast, in at least some of the records from the Battered Women's Shelter, the victim identified her abuser as "Ray Nelson."

12

pipe "extremely prejudicial."  See Tenn. R. Evid. 403, 404(b)(3).  The court ruled that all of the evidence except the alleged rape with the metal pipe would be allowed.  The court specifically allowed evidence of an alleged beating with a metal pipe.[7]  In order to allow admission of the documentary evidence in conformity with its ruling, the court ordered redaction of references to the alleged rape.

During the defendant's cross-examination, he testified that many of the situations of domestic abuse which occurred through the years were "mutual-type" occurrences.  Moreover, the defendant denied ever striking the victim with a pipe.  He said the victim would provoke him by urinating on the floor and then come at him with a knife when he said something about it.  Immediately following this testimony, the state asked the court to revisit its ruling about the alleged pipe rape.  The court decided to allow admission of this evidence in "light of [the defendant's] response that this . . . was a mutual thing and she started it as much as he did."

When asked about the sexual assault on further cross-examination, the defendant denied the event.  He explained the victim's physical findings documented in the medical records as resulting from consensual sex, rather than rape with a pipe.  On redirect examination, the defendant said that no one from the hospital or shelter had ever asked his side of the story regarding the alleged rape.

Following this testimony and a ruling by the trial court, the state entered into evidence, in unredacted form, the medical and shelter records of the alleged rape which had previously been introduced in redacted form.

We will consider the evidence in three categories -- (a) evidence of

---

[7]The alleged beating and alleged rape were part of the same incident.

non-sexual abuse about which the defendant did not challenge veracity, (2) evidence of non-sexual abuse about which the defendant challenged the veracity, and (2) evidence of sexual abuse.

## A

First, we must consider the admissibility of the state's case-in-chief evidence of abuse of a non-sexual nature for which the defendant made no veracity challenge.

As a general proposition, evidence of a defendant's character or a trait of his character is not admissible to prove that he committed the crime in question. Tenn. R. Evid. 404. However, evidence of a defendant's prior crimes, wrongs or acts may be admissible to show such other things as intent, knowledge, identity, completion of the story, opportunity and preparation. Tenn. R. Evid. 404(b); Neil P. Cohen, Sarah Y. Sheppeard, and Donald F. Paine, Tennessee Law of Evidence § 404.6 (3d ed. 1995). In order for a defendant's prior crimes, wrongs or acts to be admitted, the rule specifies three prerequisites:

(1)    The court upon request must hold a hearing outside the jury's presence;
(2)    The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and,
(3)    The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). A fourth prerequisite to admission is that the court find by clear and convincing evidence the defendant committed the prior crime. Tenn. R. Evid. 404, Advisory Comm'n Comment; State v. DuBose, 953 S.W.2d 649, 654 (Tenn. 1997); State v. Parton, 694 S.W.2d 299, 303 (Tenn. 1985).

In reviewing a trial court's decision to admit or exclude evidence, an

14

appellate court may disturb the lower court's ruling only if there has been an abuse of discretion. DuBose, 953 S.W.2d at 652; State v. Baker, 785 S.W.2d 132, 134 (Tenn. Crim. App. 1980). Where, as here, the trial court has been called to pass upon the admissibility of evidence of other crimes, wrongs or acts under Rule 404(b), its determination is entitled to deference only if it has substantially complied with the procedural requisites of Rule 404(b). DuBose, 953 S.W.2d at 652.

It is apparent from the record that the trial court held hearings outside the jury's presence. Tenn. R. Evid. 404(b)(1). Likewise, it determined that a material issue other than conduct conforming with a character trait of the defendant existed, and it stated the material issues, its ruling, and its reasons for admitting the evidence on the record. Tenn. R. Evid. 404(b)(2). The court also assessed, we believe correctly, the probative value of the evidence versus the danger of unfair prejudice from its admission. Tenn. R. Evid. 404(b)(3). However, we see no evidence of record that the trial court determined by clear and convincing evidence that the defendant committed the prior assaults against the victim. See Tenn. R. Evid. 404, Advisory Comm'n Comment; DuBose, 953 S.W.2d at 654; Parton, 694 S.W.2d at 303. Therefore, the first question becomes whether there has been "substantial compliance" with the procedural prerequisites of the rule. See DuBose, 953 S.W.2d at 652.

We hold that there was substantial compliance. Although the trial court failed to make a finding that the evidence clearly and convincingly showed that the alleged events occurred, it appears there was no real question in that regard. The defendant did not contest the veracity of the eyewitnesses' proposed testimony and voiced no specific objection to the accuracy of victim's injuries as recorded in the documentary evidence. He admitted to years of abusing the victim during his testimony. He further admitted some of this abuse had caused the victim to seek

15

hospital treatment and admission to a shelter. His only denial was that he ever hit or sexually assaulted the victim with a metal pipe. There being no real issue that the events other than the alleged metal pipe incident actually occurred, we believe the trial court's findings substantially comply with the procedural prerequisites. Accordingly, our review of the admission of this evidence is subject to the deferential abuse of discretion standard.

Moreover, we find no abuse of discretion in the trial court's admission of the evidence. The testimony during the state's case-in-chief of witnesses who had seen the defendant physically abuse the victim and who had observed the victim's physical injuries was relevant and probative of the defendant's intent to commit the crime of murder.[8] Likewise, the records further documenting these prior instances of abuse were highly probative. "[V]iolent acts indicating the relationship between the victim of a violent crime and the defendant prior to the commission of the offense are relevant to show the defendant's hostility toward the victim, malice, intent, and a settled purpose to harm the victim." State v. Smith, 868 S.W.2d 561, 574 (Tenn. 1993); see also State v. Leon Barnett Collier, No. 03C01-9602-CR-

---

[8]On the other hand, we find abuse of discretion in the trial court's determination that the evidence was admissible on the issue of identity. Evidence is admissible under Rule 404(b) only where it is probative of "some matter actually in issue." State v. Howell, 868 S.W.2d 238, 254 (Tenn. 1993) (citation omitted). There was no material issue of identity at trial. The defendant gave a pre-trial statement in which he admitted killing the victim. The contested issue was whether he did so in self defense. However, there is no harm in the trial court's erroneous ruling because the evidence was otherwise admissible to show intent.

Additionally, we question whether the evidence of the defendant's alleged prior abuse of the victim was admissible to a claim of absence of mistake or accident. We do not perceive the defendant's position to have been that he mistakenly or accidentally killed the victim. See State v. McCary, 922 S.W.2d 511, 514 (Tenn. 1996) (prior bad acts of defendant not admissible to rebut claim of accident where defendant has not asserted such as a defense). At most, his evidence is that he did not intend to kill the victim. On appeal, the state has not defended this ground for admission, and we find it unnecessary to resolve the issue because the evidence is otherwise admissible to show intent.

16

00072, slip op. at 18 (Tenn. Crim. App., Knoxville, Jan. 13, 1997) (defendant's prior violent acts toward murder victim relevant and probative of motive and intent), perm. app. denied (Tenn. 1997).

The high probative value of this evidence was not outweighed by the danger of unfair prejudice. The jury was properly instructed not to consider the evidence as indicative that the defendant acted in conformity with a character trait or his propensity for such action. Significantly, this was not a case in which the presentation of prior bad act evidence posed the danger that the jury might improperly conclude that the defendant was the person who committed the crime in question because he had committed a similar wrong against the victim in the past. Here the defendant admitted he killed the victim. Moreover, the trial court correctly found the evidence admissible under exceptions to the hearsay rule. The trial court acted within its discretion in admitting this evidence.

**B**

Next, we consider the evidence of prior abuse about which the defendant mounted a veracity challenge at the pretrial hearing. The evidence to which the defendant did mount a veracity challenge was that of the alleged assault with a pipe, both sexual and non-sexual. However, the trial court allowed only the evidence of the non-sexual pipe assault as part of the state's case-in-chief, and we consider only the propriety of that evidence in this section of this opinion.

At the pretrial hearing, the defense objected to the admission of the two sets of medical records from Akron General Medical Center and the Battered Women's Shelter. The trial court found the evidence material on an issue other than conduct conforming with a character trait of the defendant, and it found the probative value greater than the danger of unfair prejudice. However, the court

17

made no finding that the evidence clearly and convincingly established that this abuse occurred. In the pretrial hearing the defense contended the victim may have been referring to a boyfriend other than the defendant when she reported to hospital and shelter personnel that her boyfriend inflicted these injuries. At trial, the defendant denied inflicting injuries with a metal pipe. Thus, the determination that the defendant committed the prior acts documented in the medical records was a contested issue. Given this situation, we do not see substantial compliance with the procedural prerequisites of Rule 404(b) and DuBose in determining whether the evidence was admissible during the state's case-in-chief. The question becomes, then, whether the trial court nevertheless reached the proper conclusion.

In reviewing the medical records from Akron General Medical Center and the Battered Women's Shelter for the time period relevant to the alleged assault with the pipe, we find it noteworthy that the victim identified her assailant as her boyfriend in the hospital records. In another place in the hospital records, she identified the defendant as her boyfriend. She reported at the Battered Women's Shelter that she was abused by her boyfriend, with whom she had been involved for ten years. The information about the length of the victim's relationship with her boyfriend is consistent with her long-term romantic relationship with the defendant. We also find it noteworthy that the trial court admitted portions of this evidence under hearsay exceptions for excited utterance, then existing mental, emotional or physical condition, and statement for purposes of medical diagnosis and treatment. A common thread among these three hearsay exceptions is the belief that these types of statements are trustworthy because of the declarant's frame of mind or motive in speaking. See generally Neil P. Cohen, Sarah Y. Sheppeard, and Donald F. Paine, Tennessee Law of Evidence §§ 803(2).1, 803(3).2, 803(4).1 (3d ed. 1995). We believe that the trial court's finding that these statements fit within these hearsay exceptions affords them an enhanced level of reliability. When this

18

enhanced reliability in the victim's declarations that she received certain injuries at the hands of her boyfriend is coupled with the strong circumstantial evidence that the defendant is the boyfriend to whom the victim was referring, the result is clear and convincing evidence that the defendant committed the prior assault of the victim.

Had the trial court made an appropriate finding that the defendant's prior pipe assault of the victim was established by clear and convincing evidence, this would only buttress its ruling on the admissibility of the pipe assault incident. The trial court found the evidence of this incident material on an issue other than conduct conforming with a character trait of the defendant[9] and its probative value was not outweighed by the danger of unfair prejudice. We agree. This was but one other incident in a long history of violent, abusive behavior by the defendant against the victim. We fail to see how the evidence of one additional incident of the non-sexual portion of this alleged assault prejudiced the defendant.

### C

Finally, we must consider the court's ruling allowing the state to cross-examine the defendant about the alleged pipe rape and offer documentary evidence in rebuttal.[10] The trial court rationalized that this evidence should be admitted in "light of [the defendant's] response that this . . . was a mutual thing and she started it as much as he did."

---

[9]For the reasons stated in section II.A. above, we find evidence of this incident material to show the defendant's intent.

[10]The documentary evidence consisted of the medical and shelter records relevant to the alleged pipe rape. Unlike the copies of these same records admitted during the state's case-in-chief, the records the court ruled admissible at this juncture of the trial did not have the references to the alleged rape redacted.

We disagree with the trial court's decision to allow the cross-examination and admit the unredacted records. "Relevant evidence" is that evidence which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Only relevant evidence is admissible. Tenn. R. Evid. 402. The defendant's alleged rape of the victim with a foreign object does nothing to make it more probable or less probable that the victim engaged in mutual combat with the defendant or that the victim was the first aggressor in such confrontations.

Moreover, on the issue of whether the victim was the first aggressor at the time of the fatal conflict, the evidence of the specific incident of rape was not independently admissible when offered by the state to rebut defense claims that the victim was the first aggressor. Tenn. R. Evid. 404(a)(2), 405; State v. Ruane, 912 S.W.2d 766, 781 (Tenn. Crim. App. 1995) (evidence of prior violence involving the victim inadmissible under rules 404(a)(2) and 405 "if offered for anything more than mere corroboration" of the defendant's claim that the victim was the first aggressor); see also State v. Hill, 885 S.W.2d 357, 362 (Tenn. Crim. App. 1994); State v. Ray, 880 S.W.2d 700, 705-06 (Tenn. Crim. App. 1993). Nor was the evidence independently admissible as impeachment by contradiction of the defendant as a witness, as the trial court in its comments seems to suggest. See Tenn. R. Evid. 403, 607; Neil P. Cohen, Sarah Y. Sheppeard & Donald F. Paine, Tennessee Law of Evidence, §§ 607.3 (1995) (discussing the Tennessee "collateral evidence" rule that limits impeachment by fact contradiction on collateral issues to cross-examination of the witness); State v. Perkinson, 867 S.W.2d 1, 6-7 (Tenn. Crim. App. 1992); State v. Terry Bowen, No. 01C01-9505-CC-00158 (Tenn. Crim. App., Nashville, Aug. 1, 1996).

However, we are convinced that the admission of this evidence was harmless error. The defendant admitted he killed the victim. The question for the jury was not the identity of the killer, but the defendant's mental state at the time of the crime. The evidence that the defendant's acts were, at a minimum, "knowing" was overwhelming. The victim's daughters testified about the years of abuse they witnessed the defendant inflict on the victim. Furthermore, the defendant was charged with first degree murder, but the jury convicted him of second degree murder, which undercuts any argument that the jury was so inflamed by this evidence that it failed to weigh the evidence and return a just verdict.[11]

## III

In his third issue, the defendant alleges that the trial court improperly allowed Sister Repasky to testify as an expert witness on domestic violence. We find both parties' contention that Sister Repasky was allowed to testify as an expert somewhat mystifying. Extensive voir dire was conducted, culminating in the court ruling that Sister Repasky could testify as an expert on domestic violence but not battered woman syndrome. However, when the jury returned, the state never offered Sister Repasky as an expert witness. Moreover, the bulk of Sister Repasky's testimony concerned factual matters such as the contents of the victim's shelter records and the witness' recollection of the victim's stays at the shelter. The state elicited statistical evidence about domestic abuse, and the defense offered no objection.

---

[11]The defendant also claims the admission of the alleged rape deprived him of a fair trial under the federal and state constitutions. We find this issue waived for failure to cite relevant authority addressing the alleged constitutional deprivation. See Tenn. R. App. P. 27(a)(7); Tenn. R. Ct. Crim. App. 10(b). However, had the defendant properly presented a question of constitutional magnitude, we would find the error harmless beyond a reasonable doubt for the reasons discussed in the text above.

On cross-examination, the defense established that Sister Repasky could not cite to the source of some of the statistical evidence given during her direct examination. The defense also asked Sister Repasky questions based upon her years of experience in dealing with the victims of domestic abuse.

After Sister Repasky testified, the court went so far as to remind the prosecutor that she had not qualified the witness as an expert, and the prosecutor indicated she had abandoned more extensive examination of Sister Repasky because the jury looked tired.

Although the trial court allowed the state to offer Sister Repasky as an expert witness, the state never did so. Because Sister Repasky was never tendered as an expert witness, we find no justiciable issue in the defendant's claim that the trial court improperly allowed her to testify as an expert witness. Additionally, we find it noteworthy that the only evidence which arguably might require expert qualification (i.e. the statistical evidence and the testimony based upon the witness' experience) was either not objected to or elicited by the defense.

IV

The final issue is whether the trial court imposed an excessive sentence of 25 years, the maximum sentence for second degree murder. In determining whether the trial court has properly sentenced an individual, this court engages in a de novo review of the record with a presumption that the trial court's determinations were correct. Tenn. Code Ann. § 40-35-401(d) (1997). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In conducting our de novo review, we must consider the evidence at sentencing, the presentence

22

report, the sentencing principles, the arguments of counsel, the statements of the defendant, the nature and characteristics of the offense, any mitigating and enhancement factors, and the defendant's amenability to rehabilitation. Tenn. Code Ann. §§ 40-35-210(b), 40-35-103(5) (1997); Ashby, 823 S.W.2d at 168. On appeal, the appellant has the burden of showing that the sentence imposed is improper. Tenn. Code Ann. § 40-35-401(d), Sentencing Comm'n Comments (1997); Ashby, 823 S.W.2d at 169.

We find that the trial court conducted its sentencing determination under the statutory framework; therefore, its determination is entitled to the presumption of correctness.

The defendant contends the trial court erred in failing to find any mitigating factors. In his brief, the defendant recites many factors he believes should have been applied. First, the defendant turned himself in, gave a voluntary statement, and cooperated fully with the authorities. See Tenn. Code Ann. § 40-35-113(13) (1997). The defendant had tremendous remorse and potential for rehabilitation. See Tenn. Code Ann. § 40-35-113(13) (1997). The defendant had received significant prior injury from the victim. See Tenn. Code Ann. § 40-35-114(3), (4) (1997). The defendant had positive aspects to his life as evidenced by the character reference letters introduced at the sentencing hearing. See Tenn. Code Ann. § 40-35-113(13) (1997). We fail to find merit in any of these arguments.

First, we disagree that the trial court erred in its decision not to mitigate the defendant's sentence because he assisted the authorities. The defendant's actions came far too late to help the victim. By the time he turned himself in, the victim had been dead for well over a week. The defendant had already been identified as the perpetrator, and an arrest warrant had been issued.

23

Thus, his "cooperation" was of limited assistance to the authorities. Cf. State v. Aaron V. Yelloweyes, No. 01C01-9407-CC-00256, slip op. at 7 (Tenn. Crim. App., Nashville, May 11, 1995) (mitigating factor that defendant assisted authorities in locating or recovering person or property involved in crime of slight value where there was delay in defendant's assistance in leading authorities to site where victim's body was buried), perm. app. denied (Tenn. 1995). But see State v. Gilboy, 857 S.W.2d 884, 889 (Tenn. Crim. App. 1993) (sentence mitigated because defendant assisted authorities).

The trial court rejected the defendant's bid for mitigation based on remorse and potential for rehabilitation. The court found the evidence of remorse incredible.[12] Likewise, the court found the defendant's crime was "totally unnecessary," that the defendant was a violent man, and there was a lengthy history of abuse by the defendant against the victim. The trial court is in a position superior to that of this court to observe the defendant's mood and mannerisms. State v. Michael Robinson, No. 03C01-9510-CC-00303, slip op. at 24 (Tenn. Crim. App., Knoxville, June 24, 1997), perm. app. denied (Tenn. 1998). We decline to disturb the trial court's finding.

The trial court also rejected the defendant's contention that his sentence should be mitigated because he had received previous serious injury from the victim. The trial court found that the defendant was a strong man and simply could have chosen to walk away from the victim. The defendant has failed to overcome the presumed correctness of this finding.

Finally, it is apparent that the trial court was unpersuaded by the

---

[12]The defendant did not testify at the sentencing hearing; therefore, the evidence of his alleged remorse came from the trial.

defendant's character references. As previously stated, he found that there was no reason for the defendant to have killed the victim. The defendant had abused the victim for years. The defendant had serious character flaws, and the trial court did not err in failing to apply this mitigating factor.

The trial court gave great weight to the two enhancement factors it found, the defendant's past history of criminal behavior and the exceptional cruelty with which the defendant treated the victim during the commission of her murder. Considering the heavy weight afforded these factors and the absence of mitigating factors, we find that the presumed correctness of the maximum sentence imposed by the trial court has not been overcome by evidence to the contrary.

In summary, we find no error requiring reversal and affirm the judgment of the trial court.

_____
CURWOOD WITT, JUDGE

CONCUR:

_____
PAUL G. SUMMERS, JUDGE

_____
JERRY L. SMITH, JUDGE